**Opinion issued December 8, 2016**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-16-00489-CV

_____

## IN THE INTEREST OF A.K.L. AND S.A.A.P., CHILDREN

On Appeal from the 314th District Court
Harris County, Texas
Trial Court Case No. 2009-01360J

## MEMORANDUM OPINION

The trial court terminated the parental rights of L.M.L.P. to her two children, A.K.L. and S.A.A.P. In three issues, L.M.L.P. argues that the evidence was legally and factually insufficient to support the trial court's findings supporting termination of her parental rights pursuant to Texas Family Code subsections 161.001(b)(1)(N) and (O) and 161.001(b)(2). We affirm.

## Background

A.K.L. and S.A.A.P. are the children of L.M.L.P. ("Mother") and V.E.P. ("Father").[1] A.K.L. is a girl who was born in August 2000, and S.A.A.P. is a boy who was born in December 2006. In July 2008, the Texas Department of Family and Protective Services ("DFPS") received a referral of sexual abuse of A.K.L. A neighbor had called the Houston Police Department to report that, through a gap in the fence, they had observed the perpetrator "dry humping" A.K.L. Both A.K.L. and the perpetrator were clothed. The neighbor made a six minute videotape of the incident. Mother watched the incident for five minutes before intervening to stop the behavior. She "stated that she watched so long because she was waiting to see if the perpetrator was going to pull his penis out."

DFPS indicated that Mother refused psychiatric treatment for her "mental issues," which had been diagnosed as including bipolar disorder and an unspecified learning disorder. DFPS noted that Mother's "mental illness and refusal to get professional mental assistance for herself as well as her daughter, increases risk" to the children and that Mother's "mental illness led to physical neglect of the children." DFPS averred that Mother did not work and the children "suffer various forms of neglect while in their mother's care." The DFPS caseworker averred that Mother "places the children at considerable risk due to the absence of household

---

[1]     Father is not a party to this appeal.

routine, misuse of family resources, parental role and boundary problems and refusal to seek appropriate mental health care for the children and herself." The caseworker averred that Mother and Father both lacked parenting skills needed to meet the special needs of their children and that neither parent "display[ed] a concern regarding their children's special needs" or "place[d] the children's basic needs as a necessity."

DFPS also noted Mother's previous history of referrals that DFPS determined there was reason to believe. These included five referrals for incidents of physical neglect of both A.K.L. and S.A.A.P. beginning in January 2007, when S.A.A.P. was hospitalized due to rapid and substantial weight loss, and ending in July 2007, when Mother was referred due to concerns of sexual abuse of A.K.L., who had "been acting out sexually at school" and "been experiencing psychosis."

Psychological assessments determined that the children should not return to their parents' care until Mother sought further psychiatric assessment, followed any recommendations from that assessment, and sought individual and family counseling. The assessment determined that Mother would "always require supervision because of her intellectual limitations." DFPS also determined that A.K.L. had ADHD and an unspecific learning disorder and that she had problems with her behavior and her performance at school. DFPS observed that S.A.A.P., who was a toddler at the time, was "often strapped in his high chair, even when he

was not eating." The DFPS caseworker averred that Mother "reported that she has to put him in the high chair so that he does not get into everything or mess up the home as she cleaned." S.A.A.P. was "not very verbal" and "did not communicate with anyone." The DFPS caseworker reported that S.A.A.P. "was never clean during the day while in [Mother's] care."

DFPS created a family service plan at that time, but Mother failed to meet its requirements. Among other problems, Mother failed to dress appropriately for meetings with the DFPS caseworker or other people involved with the children and failed to maintain a hazard-free home. The DFPS caseworker observed Mother leaving S.A.A.P. unsupervised near a bathtub full of water and that "there was laundry piled almost waist high, dirty dishes were piled in the kitchen, the stove was [caked] with food, the floors were dirty with trash throughout the house, there were chips, coke cans, and food on the floors in the hallway and bedrooms." Mother was also uncooperative and did not participate appropriately in the children's care.

Thus, in February 2009, DFPS sought to be named the temporary managing conservator for A.K.L. and S.A.A.P., and both children were placed in a foster home. That case concluded in 2010 when the trial court issued a decree (the "2010 decree") finding that appointment of either parent as managing conservator of the children would not be in the children's best interest and appointing DFPS as sole

managing conservator of the children. The 2010 decree provided for Mother's visitation with S.A.A.P., but it ordered that she have no visitation with A.K.L. until both A.K.L.'s and Mother's therapists agreed that such visits would be in A.K.L.'s best interest. The trial court also ordered that Mother and Father undergo psychiatric evaluations, continue to engage in therapy and provide therapeutic notes and summaries to DFPS, and continue to cooperate with DFPS. DFPS continued to work with the parents to obtain stability in the home so that Mother and Father could provide sufficient care for the children.

Both children remained in their foster home and continued to receive services. Both were diagnosed with mental health disorders and learning or intellectual disabilities. S.A.A.P.'s medical and mental health records demonstrated that in early 2014, he began experiencing increased behavioral problems. His foster parents reported that he regressed after beginning court-ordered visitation with his biological parents. S.A.A.P. was moved to a residential treatment facility, and the records demonstrated that his visitation with Mother and Father was suspended due to his negative reaction to the visits and the therapist's recommendation. The records also stated that Mother and Father were not involved in his treatment as of January 2014. The child advocate likewise reported that Mother and Father failed to make adequate progress in making their home safe for their children, that Mother and Father had failed to demonstrate that they understood their children's

5

special needs, that Mother and Father continued to lack adequate parenting skills, and that Mother and Father were not participating appropriately in either child's care.

In October 2014, DFPS moved to modify the conservatorship of the children and sought termination of Mother and Father's parental rights. DFPS again placed Mother and Father on family service plans, and, following a status hearing, the trial court ordered that Mother and Father complete their new family service plans.

Mother's service plan identified changes that were needed to reduce the risk to the children, including the need for Mother to "demonstrate an understanding of and ability to provide for the special needs of the child[ren]," to address her own medical and mental health needs, and to "learn to control angry feelings and actions to prevent harm to others." The service plan set out requirements for contacting the Mental Health and Mental Retardation Authority of Harris County ("MHMRA") to inquire about services for which she would qualify and to follow any recommendations, participating in family and couple's therapy, and completing a "Trust Based Relational Intervention class at the DePelchin Children's Center" by being "successfully discharged from the class" and providing a certificate of completion to DFPS. Mother was also required to maintain a clean and hazard-free home, and the service plan specifically listed things such as removing clutter and nonfunctioning items, removing any buckets

6

filled with water and dead rodents, and removing "open electric machines that the children" can access. The plan required that Mother provide City of Houston inspectors access to the home and that the home pass inspection by October 31, 2014. DFPS believed that Mother and Father made inadequate progress and moved forward with terminating the parents' rights to A.K.L. and S.A.A.P.

At the commencement of the trial in May 2016, Father voluntarily relinquished his rights to the children. DFPS introduced evidence including the 2010 decree that it was seeking to modify, the original removal affidavit and other records, and the court-ordered service plans for both parents.[2] DFPS also presented affidavits, medical records and therapy notes, and other documents associated with its work with A.K.L., S.A.A.P., Mother, and Father.

Ashley Prince, the caseworker assigned to the children, testified at the trial. She explained the general history of the case and testified that family service plans had been developed prior to the 2010 decree and again after DFPS sought to modify that decree in 2014. Mother did not complete the services required by either plan even though DFPS "tried to work with mom and dad for an extended period of time." Specifically, Mother failed to complete the trust-based

---

[2] DPFS also introduced the criminal record of the man who was involved with the sexual abuse of A.K.L. in July 2008 that was recorded by a neighbor. The man had admitted that he was the person recorded on the videotape (but he claimed he was only trying to keep A.K.L. from hurting a cat that had crawled under a nearby shed), and he was placed on deferred adjudication for the charge of indecent exposure.

intervention therapy at DePelchin because the provider discharged her "due to [Mother] not being able to demonstrate what she was learning." Prince testified that Mother also failed to complete family or couple's therapy, she failed to follow up with her services with MHMRA, and she failed to demonstrate that the family home passed inspection with the City of Houston.

Prince also reviewed photographs of the family home and testified that the inside and outside of the home were in "disarray," which created an unsafe environment, especially for S.A.A.P. because of his extreme special needs. Prince testified that the photographs demonstrated that Mother had not made progress "towards getting [her life] in order." She identified an unsafe portable heater, plumbing problems, and incomplete or inadequate construction projects.

Prince stated that A.K.L. and S.A.A.P. were fifteen and eight, respectively, at the time of trial. A.K.L. was placed in a foster home, and S.A.A.P. was placed in the Ablaze Achievement Center. Both children exhibited "severe" special needs: A.K.L. had been diagnosed with an intellectual disability, schizophrenia, and post-traumatic stress disorder, and S.A.A.P. had been diagnosed with bipolar disorder with mixed psychoacoustic features and social communication disorder. Prince also stated that S.A.A.P. had suffered from neglect. She testified that both children's placements were meeting all of the children's physical and emotional needs. Prince testified that A.K.L. had responded well to treatment and had made a

8

lot of progress, but both children could suffer setbacks if not provided the proper care. She stated that S.A.A.P. in particular required a very structured environment, and she agreed that "there's been no . . . evidence that the parents have an understanding of even what that structure would look like much less their ability to implement it."

Prince testified that A.K.L. had told her and the therapist that she did not want to go home. A.K.L. "still seemed to be suffering from problems from [the sexual indecency] that was perpetrated on her," as demonstrated by the fact that "if you bring up either parent[], [A.K.L.] becomes very aggressive." Prince testified that although A.K.L. "did okay" during face-to-face visits with Mother, prior to those visits occurring A.K.L. was "afraid" and "paranoid" that her parents would take her away and harm her. S.A.A.P.'s visits with Mother were also "okay." Prince stated that Mother had last visited S.A.A.P. in October 2015, more than six months prior to the May 2016 trial, and that "it's been over a year" since Mother last visited A.K.L. Prince testified that she had called Mother regarding scheduling visits but was unsuccessful. She stated that Mother had not sent in any requests to visit the children.

Prince testified that termination of Mother's parental rights was in the children's best interest. She stated that terminating Mother's parental rights would allow DFPS a better opportunity to have the children adopted because it would

9

increase the number of potential placements. She further stated that A.K.L. was in an adoptive foster placement, but DFPS did not have a prospective placement for S.A.A.P. at the time of trial.

The child advocate, Cynthia Diller, testified that she became involved with this case in January 2014. She made frequent visits to the home in 2014 and "also attempted to visit in 2015[,] but the parents did not allow [her] admittance to the home." Diller took the photographs of the family home that were admitted into evidence at trial. She testified that the photographs showed "that there was basically no progress on the things that we had pointed out were safety issues. There had been a number of do-it-yourself construction projects that would require permitting by the City of Houston and an inspection by the City of Houston." These projects included structural changes and the addition of new construction that was not compliant with deed restrictions. These changes also created "a particular concern [that S.A.A.P.] could injure himself or there were safety hazards" involved with changing natural gas lines and electrical wiring. Diller stated that the home could not provide the structure and stability that both children, but particularly S.A.A.P., needed to thrive and "get better."

Diller also testified that "[a]t this point I do not believe that [Mother] has demonstrated that she is able to make the decisions and has the parenting skills to parent either child," and she believed that termination of Mother's rights would

10

provide both children the opportunity to be placed in adoptive homes. She acknowledged that DFPS currently did not have an adoptive placement for S.A.A.P., but she stated that this was because "we have not been able to broadcast [S.A.A.P.] for adoption because his parental rights had not been terminated." She admitted that the siblings would potentially be "separated geographically," but she also believed that it was possible for the siblings to have continued contact with each other.

Diller testified that she had met with both children on numerous occasions. Diller testified that A.K.L. had told her that she did not want to see her parents any more. Diller stated that S.A.A.P. "vacillates" in that he sometimes expressed a desire to go to a foster home and sometimes said "he wants to go home with those other parents," his description for Mother and Father, whom he calls by their first names. Dillard also stated that she did not believe that S.A.A.P. was mature enough to form a meaningful understanding of this case.

Dr. Faline Christensen, a therapist with LDS Family Services, began seeing Mother and Father in 2012. She stated that had seen Mother approximately eighty times, and her last session with the family was in September 2015. She testified that Mother "loves [her children] very much and feels a bond with them." Dr. Christensen testified that she was also asked by the trial court to see the family together, so she had met with the children separately and as a family unit for a

11

period of time in 2013, although her last appointment A.K.L. was in late 2013 or early 2014, and her last appointment with S.A.A.P. was in December 2014. She believed that the interactions between Mother and the children were appropriate and there was affection from both A.K.L. and Mother. S.A.A.P. in particular enjoyed seeing Mother and had a close bond with her. Dr. Christensen testified that she also observed A.K.L. exhibit paranoia and "fears about people," but she did not believe that A.K.L.'s paranoia was directed at Mother.

Dr. Christensen believed that termination of Mother's rights was not in S.A.A.P.'s best interest and that he should be able to have some contact with Mother. She also acknowledged that both children needed "substantial structure" and that there had been some problems in the home that needed to be addressed, although she also thought that the parents had made some efforts to improve the home environment. Dr. Christenson also acknowledged that Mother had demonstrated problems with responding appropriately to the children's needs and that her "own fear response impedes progress."

Father testified that he believed his children's current placements were safe. He also stated that he did not think Mother's parental rights should be terminated. However, Father testified that he and Mother still lived together and that he had relinquished his parental rights. When asked whether Mother had demonstrated some mental health issues, he testified that he "wouldn't call it mental issues." He

believed that Mother was lazy. He also acknowledged that the house would become messy. Father stated that he and Mother had been working with DFPS to complete their family service plans since 2010 and that it had been a hard process. He agreed that he had difficulty working with Mother, and that without help from another adult, Mother could not manage to provide for the children's needs.

Mother also testified that she went to family and couple's therapy and that she gave copies of the certificates to the caseworker. She acknowledged that the house never passed inspection, stating that was "because it's a very small home." When asked why she had not visited her children in over six months, Mother replied:

> Because I had no way to get up there. I do not have a driver's license. I am handicapped. I am developed mentally, just like my son and they want to put all those labels on him and I knew he had these problems when he was born. I was aware of them. I was aware of [A.K.L.'s] too. I am also aware that develop mentally challenged people can pass their tests.

Mother said that she tried to call the caseworker and left a voicemail, but the caseworker did not return her call. Mother further testified that she loved her children and wanted to continue being their mother. Mother also testified that she had been looking for a job, but did not have one at the time of trial. She acknowledged that she did not have another adult to help her care for the children during the day while her husband worked.

The trial court terminated Mother's parental rights pursuant to Family Code subsections 161.001(b)(1)(N) and (O) and found that termination was in A.K.L.'s and S.A.A.P.'s best interests. The trial court named DFPS as the children's managing conservator. Mother appealed.

## Sufficiency of the Evidence

In three issues, Mother challenges the sufficiency of the evidence supporting the trial court's determinations that termination of her parental rights was proper under Family Code subsections 161.001(b)(1)(N) and (O) and that, pursuant to section 161.001(b)(2), termination of her parental rights was in the children's best interest.

### A.    Standard of Review

In a case to terminate parental rights brought by DFPS under section 161.001, DFPS must establish, by clear and convincing evidence, (1) that the parent committed one or more of the enumerated acts or omissions justifying termination and (2) that termination is in the best interest of the child. TEX. FAM. CODE ANN. § 161.001(b) (Vernon Supp. 2016); *In re C.H.*, 89 S.W.3d 17, 23 (Tex. 2002). "Clear and convincing evidence" is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (Vernon 2014); *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009).

14

In conducting a legal-sufficiency review in a parental-rights-termination case brought by DFPS under section 161.001, we must look at the entire record to determine whether the evidence, viewed in the light most favorable to the finding, is such that a reasonable factfinder could have formed a firm belief or conviction about the truth of the matter on which DFPS bore the burden of proof. *See In re J.O.A.*, 283 S.W.3d at 344 (quoting *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)). We "must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so," and we "should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible." *Id.*; *Jordan v. Dossey*, 325 S.W.3d 700, 713 (Tex. App.—Houston [1st Dist.] 2010, pet. denied).

In conducting a factual-sufficiency review, we view the disputed or conflicting evidence. *See In re J.O.A.*, 283 S.W.3d at 345. We should consider whether the disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding. *In re J.F.C.*, 96 S.W.3d at 266. The evidence is factually insufficient only if, "in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction" regarding the finding under review. *In re J.O.A.*, 283 S.W.3d at 345 (quoting *In re J.F.C.*, 96 S.W.3d at 266).

DFPS must establish both elements—that the parent committed one of the acts or omissions enumerated in section 161.001(b)(1) and that termination of parental rights is in the best interest of the child. *See* TEX. FAM. CODE ANN. § 161.001(b); *In re C.H.*, 89 S.W.3d at 23. Termination may not be solely based on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). However, "[o]nly one predicate finding under section [161.001(b)(1)] is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest." *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003).

## B.    Findings Pursuant to Section 161.001(b)(1)(N)

In her first issue, Mother argues that the trial court's finding that she constructively abandoned A.K.L. and S.A.A.P. pursuant to Family Code section 161.001(b)(1)(N) was not supported by legally and factually sufficient evidence.

To prove that Mother constructively abandoned the children, DFPS was required to establish by clear and convincing evidence that the children had been in DFPS custody for at least six months and: (1) DFPS made reasonable efforts to return the children to Mother; (2) Mother has not regularly visited or maintained significant contact with the children; and (3) Mother has demonstrated an inability to provide the children with a safe environment. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(N); *In re A.L.H.*, 468 S.W.3d 738, 744 (Tex. App.—Houston [14th

16

Dist.] 2015, no pet). "The first element focuses on [DFPS's] conduct; the second and third elements focus on the parent's conduct." *In re A.L.H.*, 468 S.W.3d at 744. The evidence must be sufficient to support each element set out in subsection N, and DFPS bears the burden of proof. *See id.* (citing *In re D.T.*, 34 S.W.3d 625, 633 (Tex. App.—Fort Worth 2000, pet. denied), and *In re A.S.*, 261 S.W.3d 76, 90 (Tex. App.—Houston [14th Dist.] 2008, pet. denied)).

Here, the children had been in DFPS custody for well over six months: the record indicates that the trial court's 2010 decree awarded DFPS managing conservatorship of both children several years before DFPS sought to modify the 2010 decree and terminate Mother's parental rights in 2014. DFPS also made reasonable efforts to return the children to Mother, spending several years providing services to the family and creating two family service plans with a goal of reunifying Mother with A.K.L. and S.A.A.P. *See id.* ("Generally, implementation of a family service plan by [DFPS] is considered a reasonable effort to return a child to the parent."); *In re K.G.*, 350 S.W.3d 338, 354 (Tex. App.—Fort Worth 2011, pet. denied) (holding that evidence was legally and factually sufficient to establish that DFPS made reasonable effort to return child when caseworker testified that she had tried to facilitate reunification by providing services to mother, encouraging mother to seek help for her mental health problems, and making efforts to ensure that mother and child had good visits).

DFPS also presented evidence that Mother had failed to visit or maintain significant contact with the children. S.A.A.P.'s mental health records, admitted into evidence at trial, indicated that as of early 2014, Mother was no longer involved in S.A.A.P.'s care. DFPS records also indicated that Mother would not participate in addressing A.K.L.'s behavioral and mental-health problems.

Prince testified that Mother had last visited S.A.A.P. in October 2015, more than six months prior to the trial, and that "it's been over a year" since Mother last visited A.K.L. Prince testified that she had called Mother regarding scheduling visits but was unsuccessful in setting up any visitations and that Mother had not sent in any requests to visit the children. Mother herself acknowledged that she had not visited either child in more than six months because she did not have transportation and was handicapped. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(N)(ii); *In re J.J.O.*, 131 S.W.3d 618, 628–29 (Tex. App.—Fort Worth 2004, no pet.) (holding evidence was legally and factually sufficient to support finding that mother had not regularly visited or maintained significant contact with child when mother made only twelve visits during a nine-month period, was late to visits, and sometimes failed to interact with child); *In re H.R.*, 87 S.W.3d 691, 699 (Tex. App.—San Antonio 2002, no pet.) (holding evidence was legally and factually sufficient to support constructive abandonment where evidence reflected only intermittent visits).

Finally, DFPS presented evidence that Mother had demonstrated an inability to provide the children with a safe environment. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(N)(iii). The failure to complete a family service plan demonstrates an inability to provide a child with a safe environment. *See In re A.D.*, 203 S.W.3d 407, 411–12 (Tex. App.—El Paso 2006, no pet.). The children were removed from Mother's care because DFPS determined that she could not provide them with a safe environment after it discovered that A.K.L. had been the victim of a sexual assault while she was in Mother's presence. DFPS determined that Mother also neglected S.A.A.P., who was a toddler at the time, leaving him strapped in his high chair even when he was not being fed or leaving him unattended with dangers, such as a filled bathtub, within reach.

The record demonstrated that despite her knowledge of the terms and requirements of the court-ordered service plan, Mother failed to meet the requirements of that plan. Prince and Diller both testified that Mother had not made significant progress in making her home safe, and Mother herself acknowledged that her home had not passed inspection by the City of Houston, in spite of that being a requirement in her family service plan. Prince and Diller also addressed photographs demonstrating dangerous conditions that existed in the home, including an unsafe portable heater and plumbing problems. Prince and Diller also stated that Mother had failed to adequately address her own mental

health issues and that Mother did not have the necessary parenting skills to provide the care that her special-needs children required. *See In re P.R.W.*, 493 S.W.3d 738, 743–44 (Tex. App.—Corpus Christi 2016, no pet.) (holding, in context of determining whether parent created endangering environment, that "[w]hile mental illness alone is not grounds for termination, failure of a parent to take prescribed medication is relevant to endangerment"). Prince specifically stated that Mother failed to follow the recommendations made by MHMRA and that she failed to complete the trust-based intervention class at DePelchin, both of which were conditions of her service plan.

Thus, examining all of the evidence in the light most favorable to the trial court's finding, we conclude that the evidence was legally sufficient for the trial court to have formed a firm belief or conviction that Mother constructively abandoned A.K.L. and S.A.A.P. *See In re J.O.A.*, 283 S.W.3d at 344.

Mother argues on appeal that DFPS's evidence that she was unable to provide a safe environment was legally and factually insufficient. She argues that the "[t]he testimony provided during the trial was very subjective and inaccurate," that the attacks on Mother's cleanliness were subjective, and that Prince's testimony about the problems with Mother's home reflected issues that "are typical in a household." However, the record demonstrated more than mere untidiness, clutter, or general disorder. The testimony of Prince and Diller, and the other

20

information from DFPS's case file admitted into evidence at trial, indicated that the home contained hazards that made it unsafe and other issues that resulted in DFPS listing specific requirements in Mother's family service plan such as removing clutter and nonfunctioning items, removing any buckets filled with water and dead rodents, removing "open electric machines that the children" can access, and passing inspection with the City of Houston. Prince's testimony and DFPS records identified specific problems such as "laundry piled almost waist high, dirty dishes . . . piled in the kitchen, [a] stove [caked] with food, . . . floors [that] were dirty with trash throughout the house, [and] chips, coke cans, and food on the floors in the hallway and bedrooms." The trial court, acting as the factfinder in this case, was entitled to credit this specific evidence in concluding that the condition of the home was hazardous, and not merely messy in a way that is "typical in a household." *See In re J.O.A.*, 283 S.W.3d at 344–45; *In re J.F.C.*, 96 S.W.3d at 266.

Furthermore, a child's "environment" includes more than just the physical condition of his or her home. Rather, a child's "'[e]nvironment' refers to the acceptability of the child's living conditions, as well as a parent's conduct in the home." *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) (holding that factors such as "[i]nappropriate, abusive, or unlawful conduct by a parent or other persons who live in the child's home can create an

21

environment that endangers the physical and emotional well-being of a child"). As discussed above, DFPS presented evidence that Mother had neglected her children's medical and mental health needs, that she had not made adequate progress in understanding what those needs were, and had not participated appropriately in the children's care during the time DFPS was involved with the family. Father testified at trial that he did not believe Mother could provide adequate care for the children without the help of another adult, and nothing in the record demonstrated that Mother was willing or able to procure that kind of help. *See In re P.R.W.*, 493 S.W.3d at 743–44 (considering mother's failure to take medication for her mental health condition and her failure to provide adequate health care for her child in determining evidence was sufficient that mother created endangering environment for child); *In re D.S.A.*, 113 S.W.3d 567, 573 (Tex. App.—Amarillo 2003, no pet.) (holding evidence was sufficient to demonstrate parent was unable or failed to provide safe environment because of vague and unstable employment history, lack of permanent residence, failure to obtain proper medical assistance for children, recurrent alcohol abuse, and failure to abide by conditions of parole).

Accordingly, considering the entire record, we conclude that any disputed evidence was not so significant as to prevent the trial court from forming a firm belief or conviction that Mother constructively abandoned A.K.L. and S.A.A.P.

*See In re J.O.A.*, 283 S.W.3d at 345. The evidence was legally and factually sufficient to support the trial court's finding pursuant to Family Code section 161.001(b)(1)(N). *See id.*

Because we conclude that the evidence is legally and factually sufficient to support the trial court's finding pursuant to Family Code section 161.001(b)(1)(N), we need not address Mother's second issue challenging the other basis for termination of her parental rights under section 161.001(b)(1)(O). *See In re A.V.*, 113 S.W.3d at 362 ("Only one predicate finding under section [161.001(b)(1)] is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest.").

We overrule Mother's first and second issues.

## C.     Findings on Children's Best Interest

In her third issue, Mother argues that the evidence was legally and factually insufficient to support the trial court's finding that termination of her parental rights was in A.K.L.'s and S.A.A.P.'s best interest.

There is a strong presumption that the best interest of the child will be served by preserving the parent-child relationship. *See In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. TEX. FAM. CODE ANN. § 263.307(a) (Vernon Supp. 2016). The Family Code and the Texas

Supreme Court have both set out numerous factors to be considered in determining a child's best interest, including, among others: the child's age and physical and mental vulnerabilities; the desires of the child; the frequency and nature of out-of-home placement; the magnitude, frequency and circumstances of harm to the child, including current and future danger to the child; the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; the child's family's demonstration of adequate parenting skills, including providing the child and other children under the family's care with minimally adequate health and nutritional care, guidance and supervision, and a safe physical home environment; the stability of the home or proposed placement; and the parent's acts or omissions indicating an improper parent-child relationship and any excuses for the acts or omissions. *See id.* § 263.307(b); *In re R.R.*, 209 S.W.3d at 116; *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

This is not an exhaustive list, and a court need not have evidence on every element listed in order to make a valid finding as to the child's best interest. *See In re C.H.*, 89 S.W.3d at 27. The evidence supporting the statutory grounds for termination may also be used to support a finding that the best interest of the child warrants termination of the parent-child relationship. *Id.* at 28; *In re N.R.T.*, 338 S.W.3d 667, 677 (Tex. App.—Amarillo 2011, no pet.). Furthermore, the best interest analysis may consider circumstantial evidence, subjective factors, and the

totality of the evidence as well as the direct evidence. *See In re N.R.T.*, 338 S.W.3d at 677. The best-interest analysis evaluates the best interest of the child, not the parent. *Id.*

Regarding A.K.L. and S.A.A.P.'s ages and physical and mental vulnerabilities, DFPS presented evidence that the children, who were fifteen and eight, respectively, both had severe special needs that required a very structured environment and access to regular mental health care and other services. S.A.A.P. in particular required a very structured environment, and Prince and Diller both agreed that Mother was incapable of understanding or providing for the children's needs. DFPS's case file, admitted into evidence at trial, demonstrated that, from the time DFPS first removed the children from Mother's care in 2009 until the trial in 2016, Mother made insufficient progress in understanding the needs of her children or in building the skills she needed to provide for those needs. Thus, this factor weighs in favor of the trial court's best-interest findings for both children.

Furthermore, A.K.L. told numerous people, including both Prince and Diller, that she did not desire to be reunited with Mother. Diller stated that S.A.A.P. "vacillates" in that he sometimes expressed a desire to go to a foster home and sometimes said "he wants to go home with those other parents," meaning Mother and Father. However, Dillard also stated that she did not believe that S.A.A.P. was mature enough to form a meaningful understanding of this case. Because a child's

desires are relevant only to the extent that he possesses sufficient maturity to express an opinion regarding reunification, we do not find S.A.A.P.'s expressed desires here to be compelling evidence. *See In re M.H.*, 319 S.W.3d 137, 150 (Tex. App.—Waco 2010, no pet.). DFPS records introduced at trial also demonstrated that his therapist had suggested that visitation with Mother be limited because of the negative impact it had on S.A.A.P. *See In re D.W.*, 445 S.W.3d 913, 926 (Tex. App.—Dallas 2014, pet. denied) (holding that child's love for parent and enjoyment of visits is "only marginally relevant" to best-interest determination). Thus, the desires of the children weigh in favor of the trial court's best-interest finding.

Regarding the frequency and nature of out-of-home placement, the evidence at trial established that S.A.A.P. had spent the majority of his life under the managing conservatorship of DFPS and had spent relatively little time with Mother. A.K.L. had likewise spent only a little more than half of her life under Mother's care. Mother had an extensive history with DFPS, including multiple referrals before the children were removed in 2009. And, in our analysis of the trial court's finding pursuant to section 161.001(b)(1)(N), we have already determined that Mother failed to visit or otherwise maintain significant contact with her children. Evidence that a parent has failed to maintain any significant contact with the child supports a trial court's determination that termination is in the child's best

interest. *See H.N. v. Dep't of Family & Protective Servs.*, 397 S.W.3d 802, 814 (Tex. App.—El Paso 2013, no pet.).

Evidence regarding the magnitude, frequency, and circumstances of harm to the children, including current and future danger to them, likewise weighs in favor of the trial court's best-interest finding. The children were removed from Mother's care because DFPS determined that she could not provide them with a safe environment after it discovered that A.K.L. had been the victim of a sexual assault while she was in Mother's presence. DFPS determined that Mother also neglected both children and that her "mental illness and refusal to get professional mental assistance for herself as well as her daughter, increases risk" to the children. *See In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (fact finder may infer that past conduct endangering child's well-being may recur if child is returned to parent).

Furthermore, the evidence demonstrated Mother's unwillingness or inability to effect positive environmental and personal changes within a reasonable period of time. Mother failed to demonstrate adequate parenting skills, in that she failed to provide either A.K.L. or S.A.A.P. with minimally adequate mental health care, she allowed A.K.L. to be assaulted in her presence, and she neglected S.A.A.P., leaving him either confined inappropriately or unsupervised in unsafe conditions. Mother failed to provide a safe physical home environment, failed to rectify

dangerous conditions on the property, such as an exposed electrical heater, and failed to obtain the required inspection from the City of Houston, in spite of the requirements in her family service plan. It was appropriate for the court to consider that Mother did not comply with the court-ordered service plan for reunification with the children in evaluating their best interests. *See In re E.C.R.*, 402 S.W.3d 239, 249 (Tex. 2013) (stating that failure to comply with court-ordered services can support best-interest finding); *In re E.A.F.*, 424 S.W.3d 742, 752 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) (considering failure to participate in services required for reunification in reviewing best-interest determination).

The evidence at trial also demonstrated instability in Mother's home. "Stability is important in a child's emotional and physical development." *See In re T.G.R.-M.*, 404 S.W.3d 7, 17 (Tex. App.—Houston [1st Dist.] 2013, no pet.). Prince and Diller both testified that stability was important for A.K.L. and for S.A.A.P., in particular, because of their special needs.

DFPS sought termination of Mother's parental rights so that the children could be placed in more permanent, stable placements. Prince testified that the children's current placements—A.K.L.'s in a potentially adoptive foster home and S.A.A.P.'s in Ablaze Achievement Center—were meeting all of the children's needs. Both children showed improvement in the current placements, where they could receive appropriate care and education, and S.A.A.P. in particular was in

28

danger of regressing if his caregivers failed to maintain the stability and care that he needed.

Examining all of the evidence in the light most favorable to the trial court's finding, we conclude that the evidence was legally sufficient for the trial court to have formed a firm belief or conviction that termination of Mother's parental rights to both A.K.L. and S.A.A.P. was in the children's best interest. *See In re J.O.A.*, 283 S.W.3d at 344

Mother argues on appeal that DFPS failed to prove termination was in the children's best interest because it "does not have a direction for S.A.A.P. because they have no adoptive placement for him," stating that DFPS "wants the siblings 'geographically separated' if [Mother's] rights [are] removed."[3] However, the evidence at trial demonstrated that DFPS sought to terminate Mother's rights because it believed that such termination would allow it to broaden its search for

---

[3]     In a single phrase, Mother also argues that DFPS "failed to prove that there was a material and substantial change to the previous order," referring, apparently, to the trial court's 2010 decree. It does not appear that Mother presented this argument to the trial court. *See* TEX. R. APP. P. 33.1 (setting out general error preservation requirements). Nor has she adequately briefed this issue, because she includes no record citations, citations to authority, or other legal argument regarding this point. *See* TEX. R. APP. P. 38.1 (setting out briefing requirements for appellants' briefs). However, we also observe that DFPS presented evidence that, following the issuance of the 2010 decree and beginning in early 2014, S.A.A.P. in particular experienced an escalation of problematic behavior, the parents became withdrawn from care for the children and ceased visiting with them, the parents demonstrated a lack of cooperation with DFPS's efforts to work with the family, and DFPS perceived a need to broaden its search for permanent placements for both children, which could only be done by seeking modification of the 2010 decree.

adoptive placements. In particular, Diller testified that she believed termination of Mother's rights would provide both children, including S.A.A.P., the opportunity to be placed in adoptive homes. She acknowledged that DFPS currently did not have an adoptive placement for S.A.A.P., but she stated that this was because "we have not been able to broadcast [S.A.A.P.] for adoption because his parental rights had not been terminated." Separating the siblings was not, as Mother argues, DFPS's goal; rather, Diller testified that although the siblings could potentially be "separated geographically," she also believed that it was possible for the siblings to have continued contact with each other.

Furthermore, even if the trial court later determines that the children's current placement is unsuitable, this consideration does not outweigh the testimony and other evidence indicating that placement in a stable, permanent home is in the children's best interest and that Mother cannot supply such a home. *See In re C.H.*, 89 S.W.3d at 28 (holding that relevant inquiry is whether factfinder could reasonably form firm belief or conviction that termination of parental rights was in child's best interest "even if the agency is unable to identify with precision the child's future home environment").

Viewing all of the evidence, we conclude that any disputed evidence was not so significant that the trial court could not reasonably have formed a firm belief or conviction that termination of Mother's parental rights was in the children's best

interests. *See In re J.O.A.*, 283 S.W.3d at 345. Thus, we conclude that the evidence was both legally and factually sufficient to support the trial court's finding that termination was in the children's best interest. *See id.* at 344–45.

We overrule Mother's third issue.

## Conclusion

We affirm the judgment of the trial court.


Evelyn V. Keyes
Justice

Panel consists of Justices Keyes, Higley, and Lloyd.