

NUMBER 13-15-00552-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

In the Interest of P.R.W., a Child

On appeal from the County Court at Law No. 5
of Nueces County, Texas.

# MEMORANDUM OPINION

**Before Justices Benavides, Perkes, and Longoria
Memorandum Opinion by Justice Longoria**

Appellant B.W. ("Mother")[1] challenges the legal and factual sufficiency of the evidence supporting an order terminating her parental rights over her child, P.R.W. ("Child"), in a single issue. We affirm.

---

[1] We utilize aliases for the parties and the persons involved to protect the minor's privacy. *See* TEX. R. APP. P. 9.8(b).

## I. BACKGROUND

### A. 2014

On January 20, 2014, police in Corpus Christi responded to reports of a woman, Mother, slapping passing cars and yelling at the drivers not to go into an apartment building because of a gas leak. During this time, Mother was allegedly holding Child upside down by the ankles. The police detained Mother and involuntarily committed her to the hospital for a mental health evaluation. On that day, Mother tested positive for amphetamines. The Texas Department of Family and Protective Services ("the Department") filed its original petition seeking conservatorship over Child.

Mother was discharged from the hospital several days later. Her discharge reports described her as being "grossly psychotic" at the time of her arrival. The discharge papers reflect that she was diagnosed with schizophrenia and bipolar disorder, and referred to local mental health services for continued treatment. Mother testified at trial that she was diagnosed with bipolar disorder but denied having a diagnosis of schizophrenia.

Child was initially placed in foster care until M.S. and J.S. requested that the Department consider them for placement. M.S. and J.S. are the grandparents of C.B., who was Mother's boyfriend at one time.[2] Mother and Child had previously lived with C.B., but he was incarcerated during the entire pendency of this case. The Department approved M.S. and J.S.'s application, and Child resided with them for the majority of the proceedings in the trial court.

---

[2] C.B. is not Child's father. The identity and location of Child's father is unknown. The court also terminated the father's rights at trial, and he is not a party to this appeal.

Throughout the remainder of 2014 the trial court issued several orders finding that Mother did not substantially comply with the service plans setting out the conditions necessary for her to regain custody of Child. In September of 2014—shortly after Mother was allowed unsupervised visitation—Mother tested positive for methamphetamine and marijuana. Mother testified at trial that she knew at the time that Child would not be returned to her if she used illegal drugs, but could not remember why she took the drugs. At a hearing on November 5, 2014, the trial court ordered Mother to submit to further drug screenings and that her visitation rights with Child would cease if a test was positive. Mother admitted that a drug screening that day would return positive for methamphetamine. However, the court excluded that screening from the reach of the order. Mother tested positive for marijuana again in December of 2014, but her visitation rights were not curtailed. Mother tested positive for drugs a total of four times in 2014.

Lisa Cardenas, the Department caseworker assigned to Mother's case, testified that she visited Mother on August 26, 2014. During that visit, Cardenas asked to see Mother's medications. Cardenas testified that it took Mother an unusually long amount of time to find the medication and that the dates on the medication bottles were older than she expected. Cardenas also observed that the medication bottles contained unequal amounts of medication even though Mother was supposed to take the medication on a daily basis.

**B. 2015**

In January of 2015 the trial court found extraordinary circumstances to permit Child to continue in the Department's care beyond the statutory deadline to dismiss the case. *See* Tex. Fam. Code Ann. § 263.401(b) (West, Westlaw through 2015 R.S.).

3

Mother tested negative for drugs in early 2015. In March of 2015, the trial court found that Mother had substantially complied with her service plan. The trial court ordered Child returned to her custody during the week, but that Child would continue to spend the weekends with M.S. and J.S. The trial court also directed Mother to inform the Department if anyone moved into her apartment so that the Department could run a background check. Mother did not actually regain custody until April of 2015 because she took a trip to visit extended family in Boston.

During a home visit on April 23, 2015, Cardenas requested that Mother take a drug test. Mother initially agreed, but never complied with the request. Cardenas testified that she did not follow up because she did not realize until May that Mother missed her appointment for the test.

Police responded to an "overdose call" on June 2, 2015 involving Child. Police observed Mother telling a paramedic that she had given Child "gum" the night before and was subsequently "unable to walk or stand." Paramedics examined Child and cleared him of any medical problems. According to the paramedics' report, Mother insisted that Child "isn't fine." On the same day, Cardenas received phone calls from M.S. and a person at Child's daycare saying that Mother was acting erratically.[3]

Cardenas made an unannounced home visit to Mother's apartment on the same day. She found Mother there with M.L., a man unknown to the Department. Mother told Cardenas that M.L. had been living with her, but did not specify for how long. Cardenas testified at trial that M.L. was behaving erratically and asked if the Department "was

---

[3] The Department's counsel did not ask Cardenas to explain the content of the phone calls with any more specificity after Mother's counsel made a hearsay objection.

programming the children." Cardenas further testified that M.L. gestured with her arms in such a manner as to cause her to fear for her safety, and that M.L. refused to state his full name.

Cardenas then asked Mother why she did not have Child's asthma medication earlier that day even though M.S. filled the prescription and gave it to Mother the day before. Cardenas testified that Mother became agitated and accused Cardenas of having already received permission from the trial court to remove Child from her custody. Mother also stated that she believed Cardenas and M.L. were somehow involved because she had seen the two of them "together on the street." Cardenas asked Mother if she would consent to M.S. and J.S. taking care of Child for the next few days. Still agitated, Mother agreed because Cardenas allegedly already had permission to remove Child.

At Cardenas' request, M.S. and her daughter came to Mother's apartment to pick up Child. By this time, Mother's adult daughter had arrived and she and Mother were shouting at each other. Mother then asked M.S. to drive her somewhere, but Cardenas said that she would drive Mother wherever she needed to go. Cardenas testified that when they entered the car, Cardenas' phone made a "beep" noise and Mother said: "are you recording me? You're recording me. I'm not going to say anything."

Mother also said that she had recently been beaten with a bat and was "black and blue" because of it, but Cardenas testified that Mother had no visible injuries. Cardenas offered to take Mother to a woman's shelter, but Mother requested that they drive back by Mother's apartment. Cardenas then dropped Mother off by the side of the road at her request because Mother saw someone that she apparently knew.

Following a bench trial, the trial court found by clear and convincing evidence that Mother had committed three statutory grounds for termination and that termination was in the best interests of Child. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E), (N), (b)(2) (West, Westlaw through 2015 R.S.). Mother asserts in a single issue on appeal that the evidence was legally and factually insufficient to support the trial court's judgment.

## II. STANDARD OF REVIEW AND APPLICABLE LAW

The natural right between a parent and her child is of constitutional dimensions, and courts strictly scrutinize proceedings to terminate that right. *In re K.M.L.,* 443 S.W.3d 101, 112 (Tex. 2014). Because of the magnitude of the right at issue, due process requires that courts apply the clear and convincing standard of proof to termination proceedings. *Id.*; *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002). The Texas Family Code defines clear and convincing evidence as "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (West, Westlaw through 2015 R.S.).

The clear-and-convincing standard heightens a court's review of the legal and factual sufficiency of the evidence. Determining whether the evidence is legally sufficient under this standard requires us to look "at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.F.C.*, 96 S.W.3d at 266. This review requires us to assume the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so. *Id.* As a corollary, we must disregard all evidence that a reasonable factfinder could have disbelieved or found incredible. *Id.* "This does not

6

mean we must disregard all evidence that does not support the finding, but if we determine that no reasonable fact finder could have formed a firm belief or conviction that the matter to be proven is true, then the evidence is legally insufficient." *In re L.J.N.*, 329 S.W.3d 667, 671 (Tex. App.—Corpus Christi 2010, no pet.).

In a factual sufficiency review, the reviewing court asks "whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations." *In re J.F.C.*, 96 S.W.3d at 266 (quoting *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002)). The distinction with a legal sufficiency review is that courts consider whether the disputed evidence is such that a reasonable factfinder could not have resolved that evidence in favor of its finding. *Id.* The evidence is factually insufficient if the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant a factfinder could not have reasonably formed a firm belief or conviction that the allegation is true. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (per curiam).

Courts apply these standards to determine whether the Department proved by clear and convincing evidence: (1) the parent committed one or more of the statutory acts or omissions set out in section 161.001(b)(1) of the Texas Family Code and (2) termination is in the best interest of the child. *See* TEX. FAM. CODE ANN. § 161.001(b)(1), (2).

### III. DISCUSSION

#### A. Section 161.001(b)(1)(D)

##### 1. Applicable Law

Subsection D permits termination of parental rights if the parent "knowingly placed

7

or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." *Id.* § 161.001(b)(1)(D). Evidence of endangerment under subsection (D) is established by evidence related to the child's environment. *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). The child's "environment" refers to the suitability of the child's living conditions as well as the conduct of parents or others in the home. *Id.* Living conditions that are merely "less-than-ideal" do not support a finding under subsection (D). *In re A.S.*, 261 S.W.3d 76, 83 (Tex. App.—Houston [14th Dist.] 2008, pet. denied) (citing *Tex. Dep't. of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)). However, "[i]nappropriate, abusive, or unlawful conduct by a parent or other persons who live in the child's home can create an environment that endangers the physical and emotional well-being of a child" as required under this subsection. *In re S.R.*, 452 S.W.3d at 360.

### 2. Analysis

We agree with the Department that the record revealed Mother subjected Child to an endangering environment. Mother has a serious mental illness which caused her to endanger Child during the incident which began this case. Further, Cardenas' testimony permits an inference that Mother took medication for the illness only sporadically after her hospitalization. While mental illness alone is not grounds for termination, failure of a parent to take prescribed medication is relevant to endangerment. *See In re S.R.*, 452 S.W.3d at 363; *see also Maxwell v. Tex. Dep't of Family & Protective Servs.*, No. 03-11-00242-CV, 2012 WL 987787, at *10 (Tex. App.—Austin Mar. 23, 2012, no pet.) (mem. op.). More significantly, Cardenas' testimony permits an inference that Mother had stopped taking her medication by the time of the second removal; her behavior on that

8

day was similar to her actions on the day she was involuntarily committed. Mother admittedly improved enough in the time between these two events to briefly regain custody of Child, but even strong evidence of improvement cannot conclusively negate past history. *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009); *In re G.M.G.*, 444 S.W.3d 46, 60 (Tex. App.—Houston [14th Dist.] 2014, no pet.).

Also relevant is Mother's failure to retain Child's asthma medications and nebulizer. Mother did not have Child's medication even though M.S. had given it to her the day before, and Mother permitted her adult daughter to take Child's nebulizer. The trial court could have viewed this conduct as endangering Child's physical health because M.S. testified that Child had gone to the doctor a few days before because of trouble breathing. *See In re S.R.*, 452 S.W.3d at 360.

The trial court could also consider that Mother allowed Child to live with C.B. as evidence of subjecting him to dangerous conditions. Mother testified that C.B. was so aggressive towards other persons that he frequently caused the loss of their housing. Even though there is no evidence regarding C.B.'s treatment of Child, the conduct which creates a dangerous environment need not be directed at the Child. *See P.A.G. v. Tex. Dep't. of Family & Protective Servs.*, 458 S.W.3d 595, 600 (Tex. App.—El Paso 2014, no pet.).

Based on all of the foregoing, we conclude that the evidence is legally sufficient because a reasonable trier of fact could form a firm belief or conviction that Mother placed Child in dangerous conditions or surroundings. *See In re J.F.C.*, 96 S.W.3d at 266. The evidence is factually sufficient because the disputed evidence regarding endangerment is not so significant it would prevent a factfinder from reasonably forming a firm belief or

9

conviction that Mother placed Child in dangerous conditions or surroundings. *See In re H.R.M.*, 209 S.W.3d at 108.[4]

## B. Best Interest Analysis

### 1. Applicable Law

This best interest analysis requires courts to decide how best to reconcile a parent's desire to raise her child with the State's responsibility to promote the child's best interest. *In re E.R.,* 385 S.W.3d 552, 555 (Tex. 2012). There is a strong presumption that the child's best interest is served by retaining the parent-child bond, but the Department may rebut that presumption by clear and convincing evidence. *In re O.R.F.*, 417 S.W.3d 24, 39 (Tex. App.—Texarkana 2013, pet. denied) (op. on reh'g). The Texas Supreme Court has articulated a list of non-exclusive factors for courts to consider in this analysis:

1. the child's desires,

2. the emotional and physical needs of the child now and in the future,

3. the emotional and physical danger to the child now and in the future,

4. the parental abilities of the individuals seeking custody,

5. the programs available to assist these individuals to promote the best interest of the child,

6. the plans for the child by these individuals or by the agency seeking custody,

7. the stability of the home or proposed placement,

8. the acts or omissions of the parent that may indicate that the existing parent-child relationship is not a proper one, and

9. any excuse for the acts or omissions of the parent.

---

[4] We do not address whether the evidence is legally and factually insufficient under subsections (E) and (N) because the Department must prove only one statutory act or omission. *See In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012).

*In re E.N.C.*, 384 S.W.3d 796, 807 (Tex. 2012) (citing *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976)). The list of *Holley* factors is not exhaustive, and some factors will not be applicable in a particular case. *In re C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of a single factor may be sufficient to support a finding that termination is in the best interests of the child. *In re D.C.*, 128 S.W.3d 707, 716 (Tex. App.—Fort Worth 2004, no pet.).

### 2. Analysis

#### a. The Desires of the Child

At the time of trial, Child was three and a half years old. There is no evidence that Child expressed an opinion on returning to Mother's care or that Child is mature enough to form one. Some courts have concluded in similar circumstances that this factor is neutral. *See In re D.W.*, 445 S.W.3d 913, 926 (Tex. App.—Dallas 2014, pet. denied) (concluding that this factor was neutral because the child was not mature enough to express an opinion). Nevertheless, evidence that the child "loves a parent, enjoys visits, and shows affection is marginally relevant." *In re A.M.*, 385 S.W.3d 74, 82 (Tex. App.—Waco 2012, pet. denied). The first factor weighs marginally against termination. *See id.*

#### b. The Present and Future Emotional and Physical Needs of the Child; the Emotional and Physical Danger to the Child Now and in the Future.

Under these factors the Department primarily points to Mother's mental illness and its effect on her parenting. A parent's mental illness or incompetence alone is not grounds for termination, but we may consider endangering conduct caused by a parent's mental state. *In re C.M.B.*, 204 S.W.3d 886, 895 (Tex. App.—Dallas 2006, pet. denied).

11

There is no dispute that Mother's mental illness led her to endanger Child when she held Child upside down by the ankles while slapping passing cars and yelling at the drivers. As we described in greater detail above, there is strong evidence that Mother inconsistently took her medication after she was hospitalized over this incident. The trial court did find that Mother complied with her medication requirements at one point during the pendency of this case, but the trial court's finding does not mean that Mother's past conduct would not reoccur. *See In Interest of X.R.L.*, 461 S.W.3d 633, 640 (Tex. App.— Texarkana 2015, no pet.) (holding that "evidence of past misconduct or neglect can be used to measure a parent's future conduct"). Mother's behavior on the day that Child was removed for the second time supports that her past conduct informs her future behavior. It was reasonable for the trial court to infer from Cardenas' testimony regarding Mother's behavior on that day that she was no longer taking her medication and becoming delusional and paranoid as a result. Given the danger Child was in at the beginning of this case and the evidence that Mother took her medications inconsistently throughout the pendency of this case, the trial court could properly infer that there was a likelihood that Mother's mental health issues would reoccur and endanger Child. *See In re S.R.*, 452 S.W.3d at 367; *Adams v. Tex. Dep't of Family & Protective Servs.*, 236 S.W.3d 271, 280 (Tex. App.—Houston [1st Dist.] 2007, no pet.).

The trial court could also consider Mother's history of four positive drug tests during the pendency of the case.[5] That Mother continued to abuse drugs for almost a year after Child was initially removed when she knew that remaining drug free was one of the

---

[5] Mother had been earlier convicted in federal court for a conspiracy involving marijuana.

conditions of regaining custody weighs in favor of termination. *See In Interest of X.R.L.*, 461 S.W.3d at 640.

Furthermore, there is strong evidence that exposing Child to C.B. was inappropriate. Mother testified that C.B. often cared for Child because she was at work for most of the day. She also testified that C.B. frequently caused them to lose their housing because of C.B.'s aggressive behavior towards other residents. At one point, Mother decided to give up a trailer that she owned so that she, C.B., and Child could move in with M.S. and J.S. rather than require C.B. to leave. The trial court could weigh her frequent moves and inability to provide a stable home in favor of termination. *See In re S.R.*, 452 S.W.3d at 367 ("Lack of stability, including a stable home, supports a finding that the parent is unable to provide for a child's emotional and physical needs."); *In re G.M.G.*, 444 S.W.3d at 60. The trial court could also consider that Mother was unable to find Child's asthma medications on the day of the second removal. Mother's failure to have Child's asthma medication or nebulizer present in the house supports an inference that meeting Child's physical needs was not a priority for Mother. *See In re D.W.*, 445 S.W.3d at 927 (considering a parent's refusal to have her children take medically necessary medication in the best interest analysis).

The second and third *Holley* factors weigh in favor of termination.

### c. Parental Abilities of the Individuals Seeking Custody

Under this factor, the trial court could consider that Mother did not seem to appreciate the danger of her behavior as evidence of her parenting abilities. The instability of her home life with C.B. and her use of drugs for almost a year after Child was removed from her care are also relevant to her parenting abilities. *See In Interest of*

*X.R.L.*, 461 S.W.3d at 640 (holding that evidence of drug use during the course of termination proceedings is relevant to parenting abilities); *see also In re D.W.*, 445 S.W.3d at 926 (holding that the evidence of the second *Holley* factor is also relevant under the fourth). The fourth *Holley* factor weighs in favor of termination.

### d. The Stability of the Home or Proposed Placement

The Department's only proposed placement for Child was with M.S. and J.S. However, M.S. testified that she and J.S. could not commit to caring for Child until he reached adulthood because she was seventy-five years old at the time of trial. The fifth *Holley* factor is neutral regarding termination.

### e. Programs Available to Assist the Individuals Seeking Custody to Promote the Best Interest of the Child

There was no evidence in the record of the programs available to assist Mother in promoting Child's best interest if her parental rights were not terminated. The record reveals only that Mother was previously ordered to attend counseling and MHMR, and that she apparently made use of those services at some point during the case. The sixth *Holley* factor is neutral regarding termination.

### f. Plans for the Child of the Individuals or the Agency Seeking Custody

When asked about her plans for caring for Child and ensuring his safety in the future, Mother replied that she would care for him "[t]he same way I've been doing, and the way I do for my other kids." This statement does not mean that Mother is incapable of properly parenting Child, but the trial court could still properly consider it as supporting termination. By this statement, and her testimony in general, Mother did not seem to appreciate that her mental illness caused her to engage in behavior which was dangerous

14

to Child. The seventh *Holley* factor weighs in favor of her termination.

**g. The Acts or Omissions of the Parent that May Indicate that the Existing Parent-Child Relationship is not a Proper one and any Excuse for the Acts or Omissions of the Parent.**

The Department argues that the record contains several acts and omissions which indicate that the relationship between Mother and Child might be improper. We agree. As we explained in greater detail under the second and third factors, Mother subjected Child to a series of unstable residences where they lived with an extremely aggressive man. She continued to test positive for drugs almost a year after Child was first removed from her care. And, despite the role of mental illness in the incident which began this case, Cardenas' testimony suggests that Mother took her medications only sporadically.

Regarding Mother's excuses, if any, she certainly needs no excuse for having a severe mental illness. We find the efforts she made to treat her illness to be laudable. Nonetheless, we cannot ignore that Mother has also not explained how her care of Child will likely be any different going forward. The eighth and ninth factors weigh in favor of termination.

**h. Summary**

Looking at the evidence of the *Holley* factors in the light most favorable to the trial court's verdict, we conclude that the evidence is legally sufficient because a reasonable trier of fact could form a firm belief or conviction that termination was in the best interest of Child. *See In re J.F.C.*, 96 S.W.3d at 266. We conclude the evidence is factually sufficient because the disputed evidence regarding the *Holley* factors is not so significant it would prevent a reasonable factfinder from forming a firm belief or conviction that termination was in Child's best interests. *See In re H.R.M.*, 209 S.W.3d at 108.

15

We overrule appellant's sole issue.

## IV. CONCLUSION

We affirm the judgment of the trial court.


NORA LONGORIA,
Justice


Dissenting Memorandum Opinion by Justice Benavides.

Delivered and filed the
17th day of May, 2016.