

# NUMBER 13-17-00356-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

## IN THE INTEREST OF J.N.S. AND S.A.L.T., CHILDREN

### On appeal from the County Court at Law No. 1
### of Calhoun County, Texas.

## MEMORANDUM OPINION

### Before Justices Rodriguez, Benavides, and Longoria
### Memorandum Opinion by Justice Rodriguez

Appellant Mother appeals the termination of her parental rights to her children J.N.S. and S.A.L.T.[1]  By five issues, Mother asserts that the evidence was insufficient to support the trial court's findings of statutory grounds for termination and that termination was in the children's best interest.  We affirm.

---

1 We will refer to the parties and to their children by pseudonyms pursuant to applicable law.  *See* TEX. R. APP. P. 9.8(b); TEX. FAM. CODE ANN. § 109.002(d) (West, Westlaw through 2017 1st C.S.).

## I. BACKGROUND

In November of 2015, the Texas Department of Family and Protective Services (the Department) filed a petition seeking conservatorship of the children and termination of Mother's parental rights. The Department alleged that termination of Mother's rights was in the children's best interest and that Mother committed multiple infractions under the involuntary termination statute. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)–(2) (West, Westlaw through 2017 1st C.S.). The Department also sought to terminate the parental rights of Father, who is the father of J.N.S., and who does not participate in this appeal. The trial court entered temporary orders granting the Department conservatorship.

At the bench trial in June of 2017,[2] the trial court heard testimony from several witnesses.

### A. Sally Segura

Sally Segura was an investigator with the Department. Segura testified that she began investigating Mother after receiving reports that she and the children were living with Father, who had been ordered to register as a sex offender for sexual assault of a fourteen-year-old child. Segura testified without objection that she had learned from

---

[2] In cases such as this one, trial must begin within a year of the first Monday after the temporary orders are entered, and the trial court may extend this deadline up to 180 days if extension is required by extraordinary circumstances and is in the children's best interest. *See* Act of June 18, 2015, 84th Leg. R.S., ch. 944, §§ 37–38, 2015 Tex. Sess. Law Serv. Ch. 944 (S.B. 206) (current version at TEX. FAM. CODE ANN. § 263.401 (West, Westlaw through 2017 1st C.S.)). The Department moved for extension, which the trial court granted, finding that an extension was in the children's best interest and was justified by extraordinary circumstances. Mother did not challenge the timing of trial or the justification for the extension in the trial court, and she does not do so on appeal. Therefore, under the version of the statute that applied at the time the suit was filed, Mother waived "the right to complain regarding the trial court's" timing. *See In re A.B.*, 125 S.W.3d 769, 773 n.2 (Tex. App.—Texarkana 2003, pet. denied); *see also* Act of May 31, 2017, 85th Leg., R.S., ch. 319, § 33, 2017 Tex. Sess. Law Serv. Ch. 319 (S.B. 11) ("A suit affecting the parent-child relationship filed before the effective date of this Act is governed by the law in effect on the date the suit was filed, and the former law is continued in effect for that purpose.").

Father's probation officer that Father was not to have unsupervised contact with children. According to Segura, Mother had once been approved to supervise Father for these purposes, but she was no longer approved.

Based on her encounters with Mother, Segura found her to be unstable and neglectful of the children. For instance, Segura testified that during an encounter in October of 2015, J.N.S. reported: that S.A.L.T. was ill, but Mother was not tending to her; that Mother saved higher quality food for herself and did not share it with the children; that Mother often left the children with their maternal grandmother for long periods; and that Mother and Father were smoking synthetic marijuana in front of the children.

According to Segura, the Department established a safety plan to address Mother and Father's concerning behaviors, under which the children were placed with their maternal grandmother. The plan limited Mother's ability to take the children away from the maternal grandmother's house. Nonetheless, Segura testified that Mother appeared sporadically, took the children on her whim, and declined to return them, which led the Department to seek a formal removal of the children from their maternal grandmother's home.

## B. Olga Chapman

The trial court next heard testimony from Olga Chapman, who identified herself as Mother's substance abuse counselor. Chapman reported that when she began meeting with Mother in January of 2016, Mother was depressed and going through withdrawal from synthetic marijuana, which she had used daily. Mother was still in a relationship with Father, and she had no job, no place to live, and had not yet achieved a GED. However, Chapman testified that over the next year and a half, Mother consistently

3

attended counseling sessions, went on medication for depression, and maintained her sobriety, with the exception of a relapse in the weeks after the death of her mother. Chapman testified that Mother reported pursuing her GED and finding a place to live with a friend who was also in recovery, and with whom she attended narcotics anonymous meetings three times a week. Mother also reported separating from Father. Chapman agreed that Mother had quit numerous jobs in the intervening year, but believed that Mother was presently employed cleaning houses. Chapman related that Mother's preferred plan would be for the children to be taken in by Mother's uncle and for Mother to be part of the children's lives while she continued to "get herself together[.]"

However, Chapman agreed that Mother had not yet completed the substance abuse counseling portion of her service plan and had not progressed to mental health counseling, which was the next phase of her plan. According to Chapman, Mother also explained that she had a problem with lying and had been diagnosed with schizophrenia, for which she was receiving treatment from physicians at a local clinic.

### C.  Melisse Fabian

Melisse Fabian, a caseworker for the Department, testified that Mother was involved with the Department prior to the removal of the children in 2015. During her previous case, Mother successfully completed a "family plan" at the Department's behest. Fabian attested that following the 2015 removal, Mother was assigned a similar family service plan, which Mother did not complete.

Fabian testified that Mother did not successfully obtain stable housing, as required under the second family service plan. After moving out of her residence with Father, Mother reportedly spent two months living at a shelter for domestic violence victims, but

she was asked to leave due to noncompliance with the shelter's rules. Fabian testified that Mother then spent three months living in a hotel which cost almost a thousand dollars a week. Fabian attempted to verify how Mother could afford to pay for these accommodations, but Mother was not forthcoming. After leaving the hotel, Mother refused, for a time, to tell Fabian where she was living. Then, Mother reportedly told Fabian that she obtained an apartment at a local complex; however, when Fabian scheduled a visit, Mother responded that she had been evicted due to nonpayment of rent. After this, Fabian was not able to visit Mother at any location other than the Department's offices or in court. According to Fabian, Mother had also exhausted the goodwill of "several" community service providers who previously arranged to pay her housing expenses.

Fabian also testified regarding Mother's other shortcomings under her plan. Fabian related that in the months just prior to trial, the Department had become aware of an outcry from J.N.S. alleging that she had been sexually abused by "someone that [Mother] was aware of," and that J.N.S. told Mother of the problem, but Mother did nothing in response. Fabian testified that throughout the time she supervised Mother, Mother was not able to demonstrate steady employment, having obtained and then quit a single verifiable job at a restaurant. After a year and a half, Mother had not fully completed her substance abuse counseling requirement, in part because she left the process for roughly four to five months. Furthermore, Mother had not begun mental health counseling, as required under her family service plan.

5

More generally, Fabian came to view Mother as dishonest, stating that Mother would often make reports that proved unverifiable or false.[3]  In Fabian's view, Mother had not "shown or demonstrated that she can and is willing to put the children ahead of her own needs and make sure that their needs are met ahead of her own."

However, Fabian also testified about Mother's incremental successes under her plan.  Fabian agreed that Mother had initially complied with a drug and alcohol screening, had consistently attended counseling for those issues throughout the latter half of 2016 (albeit not the first half), and had been randomly tested for the presence of drugs in her system multiple times in 2016, all of which returned negative results.  To address her shortcomings in childcare, Mother completed a ten-class parenting course.  Fabian agreed that Mother had consistently followed through on visitations with her children and that she had always demonstrated positive and appropriate parenting during visits.  According to Fabian, the children loved Mother and were excited to see her, and when Mother left they were not sad "because they knew they would see her again."  In all, Fabian agreed that Mother had almost completed her service plan, with the only major outstanding requirements being to obtain stable housing and employment.

Finally, Fabian discussed the Department's plan for the children.  Fabian averred that she investigated the option to place the children with Mother's relatives, including

---

[3] Fabian discussed Mother's report that she had obtained a job paying $12 per hour, but when Fabian asked follow-up questions, Mother described the position as a minimum wage job.  According to Fabian, Mother then reported that she was employed in home health care, but Fabian could not verify this position.  Mother also represented, at one point, that she had a GED; later, Mother informed Fabian that she was near completion of her GED, and she only had to complete a test; however, Fabian attested that Mother could not provide any details related to her GED classes.  Finally, Fabian stated that, contrary to Chapman's testimony, Mother never mentioned attending narcotics anonymous meetings, which Mother would be expected to report and verify if she had in fact been attending.

home studies with a maternal aunt and grandmother, but these options proved unsuitable.[4] According to Fabian, initially, the Department's goal was reunification with Mother, but over time, as Mother made little progress overall, the Department shifted its focus to adoption or at least a consistent placement with a foster family. Thus, the Department placed the children with a foster mother who was attentive and free from troubling behaviors, and who supplied a safe and healthy environment. Fabian testified that while the placement was still new, the children had developed a bond with the foster mother and were thriving under her care.

**D.      Michelle Wilson**

The next witness was Michelle Wilson, also a caseworker for the Department, who shared Fabian's concerns over Mother's incomplete counseling requirements, her financial situation, and her lack of housing. With regard to housing, Wilson's investigation led her to believe that Mother's current living situation was unsuitable for J.N.S. and S.A.L.T., given that Mother's current cohabitant had an arrest record for robbery and narcotics and a history with the Department due to abuse and neglect of her own children. Wilson also questioned Mother's explanation of her relapse into use of synthetic marijuana, in that Mother attributed her relapse to the death of her mother in January of 2017, but she did not disclose her relapse until she was called for a random hair-follicle screening in April of 2017, which returned positive. Ultimately, Wilson

---

[4] Fabian testified that placement with the maternal aunt led to a case of lice and sores that went uncorrected, and after a few weeks, the maternal aunt no longer wished to have the children in her care because of the Department's intrusion into her personal affairs. As to the maternal grandmother, there were questions about the suitability of her house (e.g., its lack of plumbing).

believed that Mother was unable to adequately provide for the needs of the children and reiterated the Department's recommendation of termination and adoption.

## E.     Marcia Alex

Marcia Alex, a court-appointed special advocate for the children, testified that the children loved Mother, enjoyed spending time with her, and wanted to continue seeing her.   Nonetheless, Alex testified that she believed termination would be in the children's best interest because Mother could not provide the children with a stable home, whereas the children were thriving in their current foster placement.   In Alex's view, preserving the parent-child relationship would only give the children false hope of reunification.

## F.     Mother

Mother testified that she attempted to fulfill her service plan to the best of her ability, that she loved her children "dearly," and that she wanted to continue seeing them.   She testified that she was coping with her addiction, and she expressed regret at exposing her children to their prior environment, including their unsupervised exposure to Father.[5] Mother also discussed her resolve to keep up with her mental health needs through psychiatric services and medication from a local clinic.   Finally, Mother discussed her difficulty in maintaining work due to her poor work ethic and her trouble finding housing, given her criminal record.

## G.     Subsequent History

---

[5] However, Mother explained her view that Father's sexual assault charge arose because the complainant misrepresented her age to Father and that it was best viewed as a "Romeo and Juliet" situation. Counsel for Mother implied that Father's charges arose when he was much younger and that he completed the ten-year term of his probation in 2016, during the pendency of the case, but no witness confirmed this or offered further information about the nature of the charges.

Following the conclusion of testimony, the trial court entered an order terminating Mother's parental rights. Mother was found to have committed infractions under four subsections of the involuntary termination statute—specifically, subsections: (D) and (E), which relate to child endangerment; (N), which relates to constructive abandonment; and (O), which relates to failure to fulfill a family service plan. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E), (N), (O). The trial court also found that termination was in the children's best interest. *See id.* § 161.001(b)(2). This appeal followed.

## II. STANDARD OF REVIEW AND GENERAL APPLICABLE LAW

"A parent's right to the companionship, care, custody, and management of her children is a constitutional interest far more precious than any property right." *In re D.S.P.*, 210 S.W.3d 776, 778 (Tex. App.—Corpus Christi 2006, no pet.) (internal quotations omitted). Because of the fundamental rights at issue, due process requires that termination be supported by clear and convincing evidence. *In re K.M.L.*, 443 S.W.3d 101, 112 (Tex. 2014); *In re L.J.N.*, 329 S.W.3d 667, 671 (Tex. App.—Corpus Christi 2010, no pet.). Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (West, Westlaw through 2017 1st C.S.); *In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002).

In a legal sufficiency review under the clear and convincing standard, we look at all the evidence in the light most favorable to the trial court's finding, assuming that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so, and disregarding all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. *In re J.F.C.*, 96 S.W.3d at 266. If, in that light, we

determine that no reasonable factfinder could form a firm belief or conviction that the finding is true, then that court must conclude that the evidence is legally insufficient. *Id.*

When the factual sufficiency of the evidence is challenged, only then is disputed or conflicting evidence under review. *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009). If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient. *Id.*

Before parental rights may be involuntarily terminated, the trier of fact must find two elements by clear and convincing evidence: (1) that the parent committed one of the statutory grounds for termination found in section 161.001(b)(1) of the family code, and (2) that termination is in the children's best interest. TEX. FAM. CODE ANN. § 161.001(b); *In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012). Only one predicate ground under section 161.001(b)(1) is necessary to support a judgment of termination when there is also a finding that termination is in the children's best interest. *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003).

### III. GROUNDS FOR TERMINATION

By her first four issues on appeal, Mother challenges the sufficiency of the evidence showing grounds for termination.

### A. Applicable Law

Among the grounds for termination, section 161.001(b)(1)(D) permits termination if the parent knowingly placed or allowed the children to remain in conditions or surroundings which endanger the children's physical or emotional well-being. *In re P.R.W.*, 493 S.W.3d 738, 743 (Tex. App.—Corpus Christi 2016, no pet.) (mem. op.)

(quoting TEX. FAM. CODE ANN. § 161.001(b)(1)(D)). "Endanger" means "to expose to loss or injury; to jeopardize." *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996) (per curiam). Although "'endanger' means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, it is not necessary that the conduct be directed at the child or that the child actually suffers injury." *Id.* Endangerment under subsection (D) may be established by evidence related to the children's environment. *In re P.R.W.*, 493 S.W.3d at 743. The children's "environment" refers to the suitability of the children's living conditions as well as the conduct of parents or others in the home. *Id.* Living conditions that are merely less-than-ideal do not support a finding under subsection (D). *Id.* However, inappropriate, abusive, or unlawful conduct by a parent or other persons who live in the children's home can create an environment that endangers the physical and emotional well-being of the child. *Id.*

## B.    Discussion

By her first issue on appeal, Mother asserts that the evidence is legally and factually insufficient to support the trial court's finding that she knowingly placed or allowed the children to remain in conditions which endangered the physical or emotional well-being of the children. We disagree.

Mother agreed that her relationship and cohabitation with Father put the children at risk. The Department reported that J.N.S. had been molested by someone known to Mother, but that Mother had done nothing in response. *Cf.* TEX. FAM. CODE ANN. § 261.001(F) (West, Westlaw through 2017 1st C.S.) (defining "abuse" as including "failure to make a reasonable effort to prevent sexual conduct harmful to a child"). This evidence was relevant to whether Mother knowingly allowed the children to remain in a

dangerous environment. *See Jordan v. Dossey*, 325 S.W.3d 700, 722 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (listing appellant's act of leaving her young child with a sex offender in an environment populated with drug users among the evidence supporting endangerment-by-environment); *In re A.B.*, 125 S.W.3d 769, 775–76 (Tex. App.—Texarkana 2003, pet. denied) (finding that parent's failure to address known risk of sexual abuse showed endangerment-by-environment); *see also In re A.J.M.*, 375 S.W.3d 599, 607 (Tex. App.—Fort Worth 2012, pet. denied) (en banc) (related); *In re M.A.C.*, No. 04-02-00432-CV, 2002 WL 31663284, at *2 (Tex. App.—San Antonio Nov. 27, 2002, no pet.) (op., not designated for publication) (related).

Mother's use of synthetic marijuana was also germane to endangerment. When a parent has custody of children, a parent's use of narcotics and its effect on her ability to parent may cause endangerment. *See In re J.O.A.*, 283 S.W.3d at 345 & n.4 (addressing parents' chronic use of marijuana and cataloging cases). Multiple witnesses attested to Mother's "heavy addiction" to synthetic marijuana, which she used daily prior to removal of the children, and which Mother's substance abuse counselor described as more powerful and addictive than marijuana. After a year and a half, Mother still had not completed her substance abuse counseling, and instead she relapsed just prior to trial. Fabian expressed concern that Mother's use of synthetic marijuana in the same room as the children exposed them to harmful chemicals, and Mother agreed that her drug use put the children in harm's way. *See In re E.M.*, 494 S.W.3d 209, 224–25 (Tex. App.—Waco 2015, pet. denied).

There was also evidence that Mother had been diagnosed with what witnesses described as "schizophrenia" and "schizo-affective disorder." A parent's mental illness or disability, without more, is not grounds for terminating the parent-child relationship. *In re P.R.W.*, 493 S.W.3d at 744; *In re R.S.-T.*, 522 S.W.3d 92, 113 (Tex. App.—San Antonio 2017, no pet.). However, if a parent's mental state causes her to engage in conduct that endangers the physical or emotional well-being of a child, that conduct can be considered in a termination proceeding. *In re R.S.-T.*, 522 S.W.3d at 113. At the time of removal, the children resided at their maternal grandmother's house, and the impetus for the removal of the children was Mother's sporadic decisions to take the children from the home and to refuse to return them, as well as Mother's pattern of instability. It would not be unreasonable for the trial court to infer that Mother's mental health played at least some role in this behavior.

Finally, for purposes of our factual sufficiency review, the evidence of Mother's dishonesty narrows the range of "disputed evidence that a reasonable factfinder could not have credited in favor of the finding." *See In re J.O.A.*, 283 S.W.3d at 345; *In re L.M.M.*, 522 S.W.3d 34, 45 (Tex. App.—Houston [1st Dist.] 2017, no pet.) (finding the evidence factually sufficient to support termination shortly after noting that there were "numerous inconsistencies in Mother's testimony" and mother admittedly "lied to investigators").

Based on all of this evidence, the trial court determined that Mother had knowingly placed or allowed the children to remain in conditions or surroundings which endangered the children's physical or emotional well-being. *See In re P.R.W.*, 493 S.W.3d at 743.

13

Viewed in the light most favorable to the trial court's ruling, we find legally sufficient support for this ruling in the evidence of the children's exposure to daily drug use, the unsupervised presence of a sex offender, potentially unaddressed sexual abuse by another person, the specter of mental health concerns, and erratic and neglectful conduct by Mother. *See In re J.F.C.*, 96 S.W.3d at 266. We also find the evidence factually sufficient to support the finding; while it was widely agreed that Mother loved her children and made some effort to improve the children's environment, none of the disputed evidence is so significant that it would prevent a factfinder from forming a firm belief or conviction of endangerment. *See In re J.O.A.*, 283 S.W.3d at 345.

Accordingly, Mother's first issue is overruled. Because only one ground for termination is necessary, and because the evidence sufficiently supports the trial court's finding of grounds under section 161.001(b)(1)(D), we need not consider Mother's second, third, or fourth issue, which challenge the trial court's other predicate findings. *See* TEX. R. APP. P. 47.1; *In re A.V.*, 113 S.W.3d at 362.

## IV.    BEST INTEREST

By her fifth issue, Mother challenges the sufficiency of the evidence to support the trial court's finding that termination was in the children's best interest.

## A.    Applicable Law

There is a strong presumption that the best interest of the children is served by keeping the children with the natural parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam). The Department has the burden to rebut this presumption by clear and convincing evidence. *In re P.R.W.*, 493 S.W.3d at 744. The Texas Supreme Court has articulated a list of non-exclusive factors for courts to consider in this analysis:

14

(1)     the child's desires;

(2)     the emotional and physical needs of the child now and in the future;

(3)     the emotional and physical danger to the child now and in the future;

(4)     the parental abilities of the individuals seeking custody;

(5)     the programs available to assist these individuals to promote the best interest of the child;

(6)     the plans for the child by these individuals or by the agency seeking custody;

(7)     the stability of the home or proposed placement;

(8)     the acts or omissions of the parent that may indicate that the existing parent-child relationship is not a proper one; and

(9)     any excuse for the acts or omissions of the parent.

*In re E.N.C.*, 384 S.W.3d at 807 (citing *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976)).

## B.     Discussion

### (1)     The Children's Desires

Alex, the special advocate for the children, believed that the children wanted to continue seeing Mother.   It was undisputed that the children loved Mother and enjoyed visitations.   *See In re A.M.*, 385 S.W.3d 74, 82 (Tex. App.—Waco 2012, pet. denied) ("Evidence that a child loves a parent, enjoys visits, and shows affection is marginally relevant [to the desires of the child].").   This factor weighs in favor of Mother.

### (2)–(3)     Needs of the Children and Danger to the Children

The trial court heard testimony concerning Mother's completion of parenting classes and her efforts to pursue a GED.   However, it was undisputed that Mother remained unable to provide a stable home or verifiable income for the benefit of her

children. "Without stability, income, or a home, a parent is unable to provide for the child's emotional and physical needs." *In re T.G.R.-M.*, 404 S.W.3d 7, 17 (Tex. App.— Houston [1st Dist.] 2013, no pet.) (editorial marks omitted) (quoting *In re C.A.J.*, 122 S.W.3d 888, 894 (Tex. App.—Fort Worth 2003, no pet.)). Mother had no foreseeable means of improving her situation. Moreover, substitute placements with relatives— which might have helped Mother compensate for these problems—proved unsuccessful. *See In re U.P.*, 105 S.W.3d 222, 231 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (op. on mot. for reh'g) (noting within the best-interest analysis that home studies indicated "placement with appellant's mother or sister to be inappropriate.").

As to Mother's use of synthetic marijuana, "[p]ast is often prologue." *See In re S.A.H.*, 420 S.W.3d 911, 928 (Tex. App.—Houston [14th Dist.] 2014, no pet.). Despite some progress in 2016, many facts—including Mother's history of addiction, her inability to complete substance abuse counseling, and her recent relapse—demonstrated that drug use remained a likelihood, which posed a risk to the children and an impediment to meeting their needs. *See In re M.C.*, 482 S.W.3d 675, 689 (Tex. App.—Texarkana 2016, pet. denied) (citing a parent's unemployment and continued use of drugs as relevant to need and danger).

The trial court heard testimony that Mother separated herself from Father, whom the Department saw as a source of danger. However, the trial court could have also believed that Mother ignored her child's outcry of sexual abuse by another person known to Mother. *See In re A.B.*, 125 S.W.3d at 778 (citing a parent's "failure to protect the

16

emotional well-being of the children following the allegations of sexual abuse . . . and her history of drug and alcohol abuse" as relevant to the children's best interest).

In light of Mother's lack of progress toward stability, the continuing prospect of drug use, and her failure to address a grave danger to her child, the second and third factors militate heavily in favor of the Department.

### (4)  Parental Abilities of the Person Seeking Custody

Witnesses from the Department agreed that since the removal of her children, Mother regularly attended visitations and always demonstrated good parenting during visitations, and that she had completed parenting courses to improve her childcare abilities.   It is undisputed that Mother loved her children dearly.

However, we again note the evidence of Mother's failure to address J.N.S.'s outcry of abuse, Mother's use of drugs, and other anecdotal evidence of neglect, all which have a significant bearing on her parental abilities.   *See In re X.R.L.*, 461 S.W.3d 633, 640 (Tex. App.—Texarkana 2015, no pet.) (finding that a parent's failure to address sexual abuse, "her failure to remain drug free, [and] her inability or unwillingness to complete counseling . . . speak volumes about her parenting skills").

On balance, this factor weighs in favor of the Department.

### (5)  Available Assistance Programs

Mother took advantage of the assistance programs available to her, especially those prescribed under her family service plan.   However, there was testimony that Mother had exhausted many of the resources available to her:   causing her own expulsion from a shelter; depleting the generosity of "several" community service

17

providers; disqualifying herself from public housing; and completing a previous family plan under the Department's supervision, but then provoking a second intervention by the Department. Despite this assistance, Mother's circumstances had not improved.

This factor weighs in favor of the Department.

**(6)–(7)       Plans for the Children and Stability of the Proposed Placement**

Mother agreed that she should not have immediate custody, but she wished to continue visitation. Mother's plan was for the children to be taken in by her uncle so that she could remain a part of the children's lives while she improved her personal situation. No witness disputed the viability of a placement with Mother's uncle. However, many witnesses doubted that Mother's circumstances would actually improve, and some expressed concern that continued visitation would leave the children with false hope of reunification.

By contrast, the Department presented a promising, long-term plan. The children were thriving in their current placement and bonded with their foster mother, who closely attended to the children. Though the placement was new, the Department viewed it as an option that could be made permanent.

A child's need for permanence through the establishment of a "stable, permanent home" has been recognized as the paramount consideration in determining best interest. *In re G.A.C.*, 499 S.W.3d 138, 141 (Tex. App.—Amarillo 2016, pet. denied); *In re S.R.*, 452 S.W.3d 351, 369 (Tex. App.—Houston 2014, pet. denied). The factfinder could have considered whether termination would lead toward a permanent adoption, as well as whether preserving the parent-child relationship would leave the children's status in flux, with no clear path towards resolution. *See In re K.C.*, 219 S.W.3d 924, 931 (Tex. App.—

18

Dallas 2007, no pet.); *see also In re A.G.*, No. 13-17-00318-CV, 2017 WL 4546984, at *6 (Tex. App.—Corpus Christi Oct. 12, 2017, no pet. h.) (mem. op.); *cf. In re D.W.*, 498 S.W.3d 100, 113 (Tex. App.—Houston [1st Dist.] 2016, no pet.) (discussing, in a related context, concerns over "negative psychological effects on the children left in limbo").

In the interest of stability, we find that the sixth and seventh factors weigh in favor of the Department.

### (8)–(9)   Acts or Omissions of the Parent, and Any Excuse

We have already discussed Mother's negative conduct, and multiple witnesses questioned Mother's excuses for her conduct:   Wilson, who offered good reason to doubt Mother's explanation for her drug relapse; Chapman, who relayed Mother's admission to a pattern of dishonesty; and Fabian, who documented several instances where Mother gave inconsistent or unverifiable reports to the Department.

The eighth and ninth factors weigh in favor of the Department.

### C.   Summary

Our examination of the *Holley* factors reveals clear and convincing support for the trial court's best-interest finding.   *See In re K.M.L.*, 443 S.W.3d at 112; *In re P.R.W.*, 493 S.W.3d at 744.   Eight factors support the trial court's best-interest finding, and two of those factors—the needs of and danger to the children—offer significant support.   *See In re E.N.C.*, 384 S.W.3d at 807.   In contrast, only one factor weighs against that determination:   the children's desires.   *See id.*   We therefore conclude that legally and factually sufficient evidence supports the trial court's finding that termination of Mother's parental rights was in the best interest of the children.   *See In re J.O.A.*, 283 S.W.3d at 345; *In re J.F.C.*, 96 S.W.3d at 266.

We overrule Mother's fifth issue.

## V.    CONCLUSION

We affirm the judgment of the trial court.

NELDA V. RODRIGUEZ
Justice

Delivered and filed the 4th
day of January, 2018.