

# NUMBER 13-23-00049-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

## IN THE INTEREST OF L.J.T., H.G., E.G., J.L., CHILDREN

### On appeal from the 343rd District Court
### of Bee County, Texas.

## MEMORANDUM OPINION

### Before Justices Tijerina, Silva, and Peña
### Memorandum Opinion by Justice Silva

The Texas Department of Family and Protective Services (the Department) brought suit to terminate the parental rights of Tanya to four of her five minor children Lacey, Hailey, Evan, and Jared.[1] After a bench trial, the court found by clear and

---

[1] To protect the identity of the minor children, we refer to the children and their relatives by aliases. *See* TEX. FAM. CODE ANN. § 109.002(d); TEX. R. APP. P. 9.8(a).

Each child has a different biological father. Tanya's eldest minor child, Ian, resides with his biological father, who was granted sole managing conservatorship in 2019.

convincing evidence that two statutory grounds existed for terminating Tanya's parental rights and that termination was in the children's best interest. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E), (b)(2). On appeal, Tanya argues the evidence was legally and factually insufficient to support the trial court's findings on either predicate grounds or that termination was in the children's best interest.

Additionally, the Department successfully sought termination of the four fathers' parental rights. Lacey's father, Anthony, appeals.[2] Appointed counsel for Anthony has filed a motion to withdraw and a brief pursuant to *Anders v. California*, 386 U.S. 738 (1967), concluding that no arguable grounds for reversible error exist and that Anthony's appeal is frivolous and without merit. We affirm.

## I.  BACKGROUND

The Department's recommendation that the parent-child relationship be terminated is largely predicated on its thirteen-year history with Tanya, which we summarize below.

The Department was first introduced to Tanya in 2009, following reports of Tanya's drug use and subsequent convictions of two counts of delivery of marijuana to her minor niece and one count of endangering a child. Ian and Lacey were two years old and one year old, respectively, at the time. Less than one year later in March 2010, Tanya was referred to the Department for family-based safety services after she was pulled over for operating a vehicle with her child while under the influence of marijuana.

In June 2011, the Department intervened again after then-three-year-old Lacey

---

[2] No other father appealed.

2

was found walking alone one block away from her residence. The Department determined that Tanya had left Lacey under Anthony's supervision, and the case was closed.

In February 2015, the Department removed Ian, Lacey, and Hailey from the home and determined that there was "reason to believe" the children had been physically abused and neglectfully supervised by Tanya and Jack, Hailey's biological father. Tanya completed court-ordered services, and her children were returned to her care.

In December 2015, the Department reinitiated removal proceedings, concluding there was "reason to believe" Tanya had put a knife to then-three-year-old Hailey's neck. The children were returned following Tanya's completion of court-ordered services.

In January 2019, then-one-year-old Evan was hospitalized after ingesting methamphetamine. The Department removed Ian, Lacey, Hailey, and Evan from the home, where the children resided with Tanya and her then-paramour, Jaxon. After initially testing positive for cocaine and marijuana, Tanya ultimately completed her court-ordered services, and Lacey, Hailey, and Evan were returned to her care. Jaxon, however, failed to complete services and was no longer a part of the household at the time the children were returned.

By September 2019, the Department received reports of sexual abuse by Jack involving Lacey and Hailey but closed the case when they were unable to determine the veracity of the allegations.

In July 2020, three months after Jared was born, the Department received a referral alleging neglectful supervision of Lacey, Hailey, Evan, and Jared. Tanya had also reunited with Jaxon, Jared's biological father; they separated once more at some

3

unspecified point after he became noncompliant with court-ordered services. Tanya initially tested positive for cocaine but successfully produced negative drug tests thereafter, and the Department closed its case.

In June 2021, the Department received new allegations, which included: there was ongoing domestic violence in the home between Tanya and Jaxon; thirteen-year-old Lacey was being "molested by her stepbrother" and had a pregnancy scare; nine-year-old Hailey was being "sexually abused by her stepfather, [Jaxon]"; Tanya and Jaxon had been physically abusing three-year-old Evan; and there was drug use in the home.

Jesus Ortiz, an investigator with the Department, contacted Tanya at her home. According to Ortiz, Tanya and Jaxon refused to submit to a drug test or to allow anyone from the Department into the residence to assess the children or home. Tanya also declined to allow the children to be interviewed by the Child Advocacy Center or permit them to be transported to Driscoll Children's Hospital for an examination. Subsequent requests for entry into the home were denied, and the Department thereafter filed its Original Petition for Protection of a Child and for Conservatorship and for Termination in Suit Affecting the Parent-Child Relationship.

After several permanency hearings, the trial court held a bench trial. At trial, Tanya testified, admitting to domestic violence in the home and drug use by her and her various paramours, including Jaxon. Tanya further acquiesced that following the children's removal, she had begun a new relationship with an individual who was not the biological father to any of her children and who had recently been released from his twenty-year incarceration for the offense of aggravated assault with a deadly weapon. Tanya

4

conceded her relationship status on Facebook still indicated she was "in a relationship," and the couple had been posting affectionately towards one another in the weeks leading up to trial. Tanya nonetheless contended she had ended the relationship in late 2022 after the Department expressed concerns. Tanya additionally maintained she was unaware Lacey had been sexually active until she learned of Lacey's pregnancy scare, and Tanya denied physically abusing her children. Although Tanya successfully completed her court-ordered services, as she had done in all prior cases, the Department averred that Tanya's history with the Department, including her proclivity for pursuing volatile relationships and tendencies to prioritize those relationships irrespective of the danger posed to her children, evidencing her inability to consistently provide the children with a safe, stable, drug free, and family violence free-household. The trial court terminated Tanya's parental rights to Lacey, Hailey, Evan, and Jared under predicate grounds subsections (D) and (E) and determined that such termination was in the children's best interests. *See id.* § 161.001(b)(1)(D), (E), (b)(2). This appeal followed.

## II.   STANDARD OF REVIEW

"[I]nvoluntary termination of parental rights involves fundamental constitutional rights" and divests the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit from the parent. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985) (quoting *In re G.M.*, 596 S.W.2d 846, 846 (Tex. 1980)); *In re L.J.N.*, 329 S.W.3d 667, 671 (Tex. App.—Corpus Christi–Edinburg 2010, no pet.); *see In re K.M.L.*, 443 S.W.3d 101, 121 (Tex. 2014) (Lehrmann, J., concurring) ("Termination of parental rights, the total and irrevocable dissolution of the

parent-child relationship, constitutes the 'death penalty' of civil cases."). Accordingly, termination proceedings must be strictly scrutinized. *In re K.M.L.*, 443 S.W.3d at 112.

A trial court may order termination of the parent-child relationship only if it finds by clear and convincing evidence that (1) the parent committed an act or omission described in family code § 161.001(b)(1)(A)–(U) (predicate grounds); and (2) termination is in the child's best interests. TEX. FAM. CODE ANN. § 161.001(b)(1), (2). The "clear and convincing" standard requires a "measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* at § 101.007. This standard falls between the preponderance of the evidence standard of ordinary civil proceedings and the reasonable doubt standard of criminal proceedings. *See In re G.M.*, 596 S.W.2d at 847; *In re L.J.N.*, 329 S.W.3d at 671.

Evidence is legally sufficient to support termination if a reasonable factfinder could form a firm belief or conviction that the finding was true. *In re A.C.*, 560 S.W.3d 624, 630–31 (Tex. 2018). In conducting a legal sufficiency review, we assume that the factfinder resolved disputed facts in favor of its finding if it was reasonable to do so, and we disregard all evidence that a reasonable factfinder could have disbelieved or found to be incredible. *In re L.J.N.*, 329 S.W.3d at 671. We must also consider undisputed evidence, if any, that does not support the finding. *In re K.M.L.*, 443 S.W.3d at 113; *see In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002) ("Disregarding undisputed facts that do not support the finding could skew the analysis of whether there is clear and convincing evidence.").

Evidence is factually insufficient to support termination "if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of

6

a finding is so significant that the factfinder could not reasonably have formed a firm belief or conviction that the finding was true." *In re A.C.*, 560 S.W.3d at 631 (citing *In re J.F.C.*, 96 S.W.3d at 266). Under the factual sufficiency standard, we defer to the factfinder's determinations on the credibility of the witnesses "so long as those determinations are not themselves unreasonable." *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (per curiam) (quoting *Sw. Bell Tel. Co. v. Garza*, 164 S.W.3d 607, 625 (Tex. 2004)); *see also In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002) ("A standard that focuses on whether a reasonable jury could form a firm conviction or belief retains the deference an appellate court must have for the factfinder's role.").

### III.    PREDICATE GROUNDS

The trial court found that Tanya "knowingly placed or knowingly allowed [Lacey, Hailey, Evan, and Jared] to remain in conditions or surroundings which endanger the[ir] physical or emotional well-being" and "engaged in conduct or knowingly placed [Lacey, Hailey, Evan, and Jared] with persons who engaged in conduct which endangers the[ir] physical or emotional well-being." *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E). On appeal, Tanya argues the evidence is legally and factually insufficient to support termination under either predicate ground.

### A.    Applicable Law

Under subsection (D), "we must examine the time before the children's removal to determine whether the environment itself posed a danger to the [children's] physical or emotional well-being." *In re L.W.*, 609 S.W.3d 189, 199–200 (Tex. App.—Texarkana 2020, no pet.) (quoting *In re L.C.*, 145 S.W.3d 790, 795 (Tex. App.—Texarkana 2004, no

7

pet.)). The children's physical health or emotional well-being is endangered when the parent fails to remove them from a home in which abusive or violent conduct is occurring. *Id.* Unsanitary living conditions may also endanger the children's physical or emotional well-being by posing a health risk to the children, *In re S.B.*, 597 S.W.3d 571, 584 (Tex. App.—Amarillo 2020, pet. denied), as does "[i]nappropriate, abusive, or unlawful conduct by a parent or other persons who live in the child's home." *In re P.N.T.*, 580 S.W.3d 331, 355 (Tex. App.—Houston [14th Dist.] 2019, pet. denied); *see In re J.W.*, 645 S.W.3d 726, 749 (Tex. 2022) ("The suitability of a child's living conditions and the conduct of parents or others in the home are relevant to a [s]ubsection (D) inquiry."); *see also In re G.J.A.*, No. 13-22-00209-CV, 2022 WL 3092177, at *5 (Tex. App.—Corpus Christi–Edinburg Aug. 4, 2022, no pet.) (mem. op.) ("Parental and caregiver illegal drug use and drug-related criminal activity support[] the conclusion that the child's surroundings endanger [her] physical or emotional well-being."). Additionally, subsection (D) permits termination based on only a single act or omission. *In re V.A.*, 598 S.W.3d 317, 329 (Tex. App.—Houston [14th Dist.] 2020, pet. denied).

In contrast, subsection (E) requires evidence of a "voluntary, deliberate, and conscious course of conduct by the parent" and generally more than a single act or omission. *In re D.L.W.W.*, 617 S.W.3d 64, 78 (Tex. App.—Houston [1st Dist.] 2020, no pet.) (quoting *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.)). "Among the types of actions or omissions constituting evidence meeting this standard are criminal activity, convictions, and incarceration." *In re J.F.-G.*, 612 S.W.3d 373, 383 (Tex. App.—Waco 2020), *aff'd*, 627 S.W.3d 304 (Tex. 2021). A trial court may consider actions

8

and inactions occurring both before and after a child's birth and before and after removal to establish a parent's course of conduct. *Id.* "Additionally, a parent's past endangering conduct may create an inference that the parent's past conduct may recur and further jeopardize a child's present or future physical or emotional well-being." *Id.*

The primary difference between subsection (D) and subsection (E) is that subsection (D) focuses on the child's conditions or surroundings while subsection (E) focuses on the parent's or another's conduct, whether by overt act or omission. *In re A.L.H.*, 624 S.W.3d 47, 55–56 (Tex. App.—El Paso 2021, no pet.). However, the same evidence may support a finding under either subsection, depending on the circumstances. *Id.* (providing the example of continued domestic violence in the home with the children as grounds under both subsections (D) and (E)). As applied to both, we consider that "endangerment encompasses 'more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment.'" *In re D.L.W.W.*, 617 S.W.3d at 78 (quoting *Tex. Dep't of Hum. Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)). "'[E]ndanger' means to expose to loss or injury; to jeopardize." *In re J.F.-G.*, 627 S.W.3d 304, 312 (Tex. 2021) (quoting *Boyd*, 727 S.W.2d at 533).

## B.    Discussion

Here, there was ample evidence of inappropriate or unlawful conduct in Tanya's home before the children's removal in 2021 and throughout the pendency of this case. As indicated *supra*, the Department intervened in 2009 following Tanya's felony convictions of delivery of marijuana to a minor and endangering a child. *See In re A.M.R.*, 652 S.W.3d 117, 122 (Tex. App.—Waco 2022, pet. denied) ("[A] parent's criminal

9

conduct, convictions, or imprisonment are relevant to the question of whether she engaged in endangering conduct."). Each Department intervention thereafter—in March 2010, June 2011, February 2015, December 2015, January 2019, September 2019, July 2020, and June 2021—was spurred by substantiated allegations of neglect, physical abuse, and substance abuse in the home, with the most severe allegations occurred nearly one decade after the Department's initial intervention. *See In re N.J.H.*, 575 S.W.3d 822, 832–33 (Tex. App.—Houston [1st Dist.] 2018, pet. denied) (considering domestic violence in the home and a parent's propensity for violence as evidence of endangerment); *In re R.S.-T.*, 522 S.W.3d 92, 110 (Tex. App.—San Antonio 2017, no pet.) ("It is not necessary that the parent's conduct be directed at the child or that the child actually be injured; rather, a child is endangered when the environment or the parent's course of conduct creates a potential for danger which the parent is aware of but disregards."); *In re C.J.O.*, 325 S.W.3d 261, 265 (Tex. App.—Eastland 2010, pet. denied) ("If a parent abuses or neglects the other parent or other children, that conduct can be used to support a finding of endangerment even against a child who was not yet born at the time of the conduct.").

During the trial, Clarissa Perez, a caseworker with the Department, testified that Lacey had disclosed a specific incident of physical abuse, wherein Tanya had hit her in the face "with a belt buckle" in 2015. Perez testified that this had not been an isolated incident, questioning Tanya's ability to "consistently parent appropriately." Tanya also held a knife to Hailey's throat when she was a toddler, and in 2019, Evan was found to have had "unexplained" bruising all over his body when he was hospitalized after he

10

ingested methamphetamine. Investigator Ortiz additionally testified to incidents of Evan reportedly being "tied up to his car seat" and "hit with a belt" by Tanya. Evan also had an untreated lice infestation at the time of removal.

Further, evidence of domestic violence between Tanya and her various paramours—the children's respective fathers whom all have criminal histories—as well as continued substance abuse by Tanya[3] and each of her paramours was prolific at trial. The Department also produced evidence of Tanya's awareness of the on-going sexual abuse involving Lacey. Perez testified that Tanya's relationship with Lacey more closely resembled a friendship than a mother-daughter relationship, with Tanya framing the alleged sexual abuse between her then-twelve-year-old daughter and known sixteen-year-old individual, as consensual. Perez moreover spoke of three instances of improper communications facilitated by Tanya after Lacey had been removed from her home, wherein Tanya had provided cell phones to Lacey and instructed Lacey to keep them in secret so Lacey could remain in contact with her boyfriend and her.

Tanya testified, conceding that her children may have witnessed domestic violence between her and her paramours. *See In re R.S.-T.*, 522 S.W.3d at 110 ("Domestic violence, want of self-control, and propensity for violence may be considered as evidence of endangerment." (quoting *In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.))); *In re P.R.W.*, 493 S.W.3d 738, 744 (Tex. App.—Corpus Christi–Edinburg 2016, no pet.) (concluding that even where "there is no evidence regarding [a paramour's] treatment of [the c]hild, the conduct which creates a dangerous environment

---

[3] Tanya tested positive for marijuana three out of the nine times she submitted to drug testing.

11

need not be directed at the [c]hild"). Specifically, Tanya testified that Lacey had witnessed Jack "choke" her. Tanya, however, refuted allegations that her most recent partner, an individual whom she pursued after separating from Jaxon post-removal, had been physically abusive towards her. Tanya stated that though he may have the "worse [sic] background out of all the relationships [she has] been in," he "was the best one out of all of them" and had "never laid his hands on [her]."

Tanya additionally averred that she had never exposed the children to drug use, testifying that she "quit" using marijuana in 2009; Hailey's statements to the contrary were untrue; any of her positive tests for marijuana during the pendency of this case were the result of her cannabidiol use; and she did not know whose methamphetamine Evan had accidentally consumed in 2019. Tanya did not otherwise address the Department's allegations relating to her cocaine or marijuana use prior to the children's removal in 2021. Tanya stated that though she had "mess[ed] up whenever [she] picked the wrong boyfriends or husband or whatever," and had chosen to pursue relationships with paramours that were known drug users, she "did try to change over the years here and there with certain things." *See In re A.L.S.*, 660 S.W.3d 257, 272 (Tex. App.—San Antonio 2022, pet. denied) (considering the paramour of a parent's drug use as evidence of endangerment where the paramour was present in the home).

Tanya further refuted allegations of physical abuse, denying that she had ever strapped her child to a car seat as a form of discipline and explained that Lacey had been struck in the face inadvertently when Tanya was "trying to spank her butt" with the belt.

Regarding the sexual abuse between Lacey and any males known to Tanya, Tanya testified that though she tried getting Lacey on birth control, she also never condoned it.

"In a bench trial, the trial court acts as the fact[]finder and is the sole judge of witness credibility." *In re A.M.*, 418 S.W.3d 830, 841 (Tex. App.—Dallas 2013, no pet.) (citing *Nguyen v. Nguyen*, 355 S.W.3d 82, 88 (Tex. App.—Houston [1st Dist.] 2011, pet. denied)). The trial court here was free to believe one witness over another and disbelieve Tanya's testimony accordingly. *See In re H.R.M.*, 209 S.W.3d 105, 109 (Tex. 2006). Moreover, from the evidence, the trial court could have reasonably concluded that Tanya's history of drug use constituted conduct that endangered her children's physical and emotional well-being irrespective of Tanya's insistence of sobriety and evidence of sporadic negative test results. *See In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009) ("[E]vidence of improved conduct, especially of short-duration, does not conclusively negate the probative value of a long history of . . . irresponsible choices."); *Boyd*, 727 S.W.2d at 533 (because it significantly harms parenting relationship, drug activity can constitute endangerment even if it transpires outside child's presence). Furthermore, evidence of Tanya's abusive conduct towards her children and abusive conduct by her paramours towards her in front of her children permits an inference of violence in the home will persist in the future. *See In re J.F.-G.*, 612 S.W.3d at 383.

Considering the entire record, including evidence both supporting and contradicting the trial courts findings, we conclude that the contrary evidence is not so overwhelming as to undermine the court's conviction that Tanya both engaged in conduct that endangered her children's physical or emotional well-being and knowingly placed or

13

knowingly allowed her children to remain in conditions or surroundings which endangered their physical or emotional well-being. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E); *In re J.F.C.*, 96 S.W.3d at 261, 266. We hold that the evidence is legally and factually sufficient to support the trial court's finding by clear and convincing evidence. We overrule Tanya's first issue.

## IV.    BEST INTEREST

By her second issue, Tanya argues that termination is contrary to the children's best interest.

## A.    Applicable Law

"The best-interest prong of the termination inquiry 'is child-centered and focuses on the child's well-being, safety, and development.'" *In re J.W.*, 645 S.W.3d at 746 (quoting *In re A.C.*, 560 S.W.3d at 631). We may presume that prompt and permanent placement of the child in a safe environment is in the child's best interest. TEX. FAM. CODE ANN. § 263.307(a). The Texas Supreme Court has identified several nonexclusive factors for courts to consider in determining the child's best interest, known as the *Holley* factors. *See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). These factors include: (1) the child's desires; (2) the child's present and future emotional and physical needs; (3) the present and future emotional and physical danger to the child; (4) the parenting abilities of the individuals seeking custody; (5) the programs available to assist those individuals to promote the child's best interest; (6) the plans for the child by those individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the parent's acts or omissions that may indicate the existing parent-child relationship is an

14

improper one; and (9) any excuse for the parent's acts or omissions. *Id.* at 371–72. Evidence that is probative of grounds for termination may be probative of the best interest of the child, as well. *In re C.H.*, 89 S.W.3d at 28. "A best interest finding, however, does not require proof of any particular factors." *In re Z.R.M.*, 665 S.W.3d 825, 829 (Tex. App.—San Antonio 2023, pet. denied).

## B.    Discussion

### 1.    The Children's Desires

Perez testified that Lacey was the only child who had unequivocally expressed a desire to return home to Tanya: "With [Lacey], she states that she wants to go back to her mom because she wants to be able to see her other family members, she wants to be with her friends that she had when she was with [Tanya]." Perez opined, however, that she did not believe that Tanya and Lacey had a "healthy bond" and stated that sometimes their conversations composed of inappropriate topics. "[Tanya] has come into visits asking [Lacey] what the flavor of the week is," explained Perez.

Whereas Hailey is "scared that [Tanya] is going to have more boyfriends, another baby, [Hailey is] going to be the one taking care of her siblings, there's going to be more domestic violence or drugs," testified Perez. Psychological progress reports in the record indicate that Hailey was unequivocal about her desires to remain with her foster family. Hailey reportedly told Tanya that "she would like to get adopted so she doesn't have to worry" about home stability, and Tanya "let [Hailey] know she respects that [Hailey] is not wanting to return home" and "acknowledged her role" in Hailey's repeated displacement. Another progress report indicated that during one psychology session, Hailey cried

15

throughout its entirety, worried about whether "she is making enough changes to be wanted by the foster family." At trial, several letters written by Hailey, addressed to the court were also admitted into evidence. One letter is included in its entirety below:

> I am scared about if we are going home. I do not want to go home. Because I am scared everything is going to be the same. I mean as like her making me as the mommy. And have to stay home with my sister a lot. Way [sic] she is with her friends. I do not want to tell her that because I do not want to make her mad or sad at all. I want to get adopted. They are the most people [sic] that has always been there for for [sic] so long. And no one else. I wish I did not have to be the kid that has lots of boyfriends. I wish I did not have to deal with this family anymore at all. I do not want to go home. I hate it there[.] I have to be the mom[.] I have to cook[.] I have to clean the house. I hate being the mom[.] I hate it[.] I do not like to be left at home e[i]ther. I want to be a kid not the mom. I want to get adopted.

As for the two youngest children, Evan and Jared, Perez described the children as being "receptive" and "very loving" towards Tanya. Though too young to comprehend their options, Perez noted, however, that both were bonded to the foster family and have spent more time outside of Tanya's home than in her care. *See In re J.W.*, 645 S.W.3d at 747 ("Importantly, given the child-centered focus of the best-interest inquiry, we may not discount or minimize the level of permanence J.W. has achieved with his foster family, with whom he has lived since he was a month old."); *In re J.M.*, 156 S.W.3d 696, 706 (Tex. App.—Dallas 2005, no pet.) (providing that when children are too young to appropriately express their desires, a court may consider the quality and extent of the children's relationship with the prospective placements). This factor weighs in favor of termination.

16

**2.      The Children's Emotional and Physical Needs, Mother's Parental Abilities, and Stability of the Home**

At the time of trial, Jared and Hailey were residing with the same foster family in Corpus Christi. Perez testified that Jared and Hailey had "bonded with their foster parents," were both thriving in the home, and Hailey was no longer behind in school. The foster family had expressed a desire to adopt both children. Nothing in the record establishes that Jared has any special physical, emotional, or psychological needs. Whereas Hailey was diagnosed with attention deficit disorder and unspecified adjustment disorder, and she attended weekly therapy.

Evan, who had initially been placed in the same foster home as Jared and Hailey, was transferred to a therapeutic home in Houston in July 2021 following "extremely disruptive" outbursts and displays of "physical aggression." Perez explained that the therapeutic home was required to better assess and address Evan's individual needs and provide Evan with "[a]round-the-clock care." After receiving several diagnoses, which included post-traumatic stress disorder and conduct disorder, and a subsequent recommendation by his therapist that in-person visitations cease, Evan stopped attending visitations with Tanya in October 2021. Perez reported that Evan made substantial progress in the months that followed. Evan has since bonded with his new foster family, and they have expressed interest in adoption.

Lacey, diagnosed with major depressive disorder and adjustment disorder, lived in Toledo, Texas with her paternal aunt who also had expressed a willingness to adopt her. Psychologist notes dated November 2022 indicated that Lacey, like Hailey, felt that their mother had failed to meet their needs in the past. Lacey explicitly "expressed resentment

17

and frustration with [Tanya] about being in foster care repeatedly" and "blamed [Tanya] for her behavior problems" in school and with authority figures. Lacey, at fourteen years old, has had over fifteen placements in her life.

As for Tanya, she was diagnosed with a moderate cannabis use disorder and anti-social behavior. Therapy notes from the Department's prior involvement indicated Tanya had a propensity for re-engaging in poor decision making: "[Tanya] appeared to engage in minimization, making it difficult to gain an understanding of her current functioning." Tanya's current psychologist opined that it was not her recommendation that the children be returned, noting that Tanya had not "shown the court [that] she can handle her responsibilities with all her children."

At trial, Tanya averred that she had changed because now she is "choosing [her] kids over everything" and complained that the Department had stymied her ability to demonstrate her parental abilities. "I never had any unsupervised visits. I never had overnights. I never had nothing [sic]. It was just straight up just one hour," Tanya testified. Nonetheless, documented instances of Tanya's failure to meet her children's needs, coupled with a volatile home life filled with exposure to drug use and domestic violence, as well as a disinclination to appreciate the danger of her past behaviors, is all evidence of inappropriate or inadequate parenting abilities. *See In re P.R.W.*, 493 S.W.3d at 746 (providing that evidence of an unstable home life and drug use during termination proceedings is relevant to parenting abilities).

In summation, evidence at trial indicated that the children's needs were unmet with Tanya in the past and unlikely to be met in the future, the children's needs had been

18

consistently met in foster care, and the proposed placement for each child had the opportunity for permanency. *See In re R.S.-T.*, 522 S.W.3d at 113 ("The need for permanence is the paramount consideration for the child's present and future physical and emotional needs." (quoting *Dupree v. Tex. Dep't of Protective & Regul. Servs.*, 907 S.W.2d 81, 87 (Tex. App.—Dallas 1995, no writ))). Thus, these factors weigh in favor of termination.

### 3. Acts or Omissions that May Indicate the Existing Parent-Child Relationship is Improper and Any Excuse for Acts or Omissions

Lacey, Hailey, Evan, and Jared have been repeatedly removed from Tanya's care due to ongoing neglect, domestic violence, drug use, physical abuse, and sexual abuse in her home. Tanya attributed all the "bad things" which have occurred in her life to "[a]ll the wrong men [she] dated" and the "all the bad things they did to [her], all the abusive relationships, mentally, physically, like, all the drugs" as well as to her upbringing:

> [W]hen I was young[,] I had to deal with my sister by myself because my mom was always out . . . . And, like, all the multiple relationships she's had were either all alcoholics or abusive or, you know, partying, whatever. Like, that's all I knew . . . . But instead of me doing the right thing and doing better than what my mom has done, I didn't do that. I ended up doing wrong, too, and that's where I went wrong. I should have wanted better for my kids. I should have wanted to be a better mom to my kids. And that's where I made my mistakes.

Moving forward, Tanya maintained she would choose differently; she would choose her children. Prior to the most recent removal, Tanya had completed over two hundred hours of counseling and parenting classes. Tanya's responses regarding the most severe reported incidents are summarized as follows:

- Tanya denied selling drugs to a minor in 2009. She testified she had only "allowed [her 13-year-old niece] to smoke with [her] one time,"

19

and her relatives had fabricated the other incident that also contributed to Tanya's delivery of marijuana conviction.

- Tanya denied knowing whose methamphetamine Evan ingested because although her paramour at the time "had a problem with meth," her paramour had denied that it was his so she did not know if it was his or "somebody else's" since they "did have a lot of drug addicts walking through there."

- Tanya denied doing drugs in front of her children despite claims to the contrary by her children and denied smoking marijuana during the pendency of this case, refuting the existence of several positive results and results indicating urine samples had been diluted.

- Tanya denied physically abusing her children in the past, testifying that she had accidentally hit Lacey in the face with the belt and never left Evan in the car seat as a form of punishment.

- After admitting that her former relationships had been physically abusive, Tanya denied that her most recent paramour had been abusive despite his prior felony assault conviction. She also refuted the existence of an on-going romantic relationship with him, although she did not deny that her Facebook profile still states that she is "in a relationship," she had recently referred to him as "Babe" in posts and had uploaded photographs of them together with photoshopped hearts over them, and on the day of trial, he made a "long post about what a big day today is and how they're going to get their kids back."

These factors weigh in favor of termination.

### 4.     Summary

Having reviewed the entirety of the record, we conclude that the evidence was legally and factually sufficient to support the trial court's finding that termination of the parent-child relationship was in the best interest of each child by clear and convincing evidence. Tanya's second issue is overruled. *See In re G.M.*, 596 S.W.2d at 847; *In re L.J.N.*, 329 S.W.3d at 671.

20

## V.     ANTHONY

At the time of trial, Anthony was incarcerated. Anthony testified that when Lacey was removed from Tanya's home over one year prior, he had also been incarcerated. Anthony conceded he had further spent the first five years of Lacey's life incarcerated. Anthony testified he believed he was "equal parts" responsible for the Department's involvement in Lacey's life. Although Anthony asked that his parental rights not be terminated, he also advocated for Lacey to remain in her current foster placement, stating that he still needed to "get a job, get back on [sic] feet, stay sober, and be a more productive citizen."

Anthony's court-appointed counsel has filed a brief concluding that the appeal is frivolous and without merit. *See Anders*, 386 U.S. at 744; *In re P.M.*, 520 S.W.3d 24, 27 & n.10 (Tex. 2016) (per curiam) (approving use of *Anders* procedure in appeals). The brief meets the requirements of *Anders* by presenting a professional evaluation of the record and demonstrating why there are no arguable grounds to be advanced on appeal. *See* 386 U.S. at 744. Anthony's counsel has certified to this Court that she has provided Anthony with a copy of the *Anders* brief and informed him of his right to receive a copy of the entire appellate record and file a pro se brief. To date, Anthony has not filed a pro se brief.

We have conducted a full examination of all the proceedings to determine whether the appeal is wholly frivolous, as we must when presented with an *Anders* brief. *See Penson v. Ohio*, 488 U.S. 75, 80 (1988); *see also In re A.A.Z.*, No. 13-21-00160-CV, 2021 WL 5225440, at *8 (Tex. App.—Corpus Christi–Edinburg Nov. 10, 2021, pet. denied)

21

(mem. op.). After reviewing the *Anders* brief, the record, and the trial court's predicate grounds and best interest findings, we have found no non-frivolous issues that could be raised on appeal. *See generally In re N.G.*, 577 S.W.3d 230, 237 (Tex. 2019) (holding that "due process and due course of law requirements mandate that an appellate court detail its analysis for an appeal of termination of parental rights under section 161.001(b)(1)(D) or (E) of the [Texas] Family Code"). We agree with Anthony's counsel that the appeal is frivolous and without merit.

Additionally, Anthony's counsel has filed a motion to withdraw. "However, when an *Anders* brief is filed in a parental termination appeal, the appellant's right to appointed counsel extends to "all proceedings in [the Texas Supreme Court], including the filing of a petition for review." *In re P.M.*, 520 S.W.3d at 27 (citing TEX. FAM. CODE ANN. § 107.013(a)(1)). Thus, in the absence of additional "good cause" grounds for withdrawal, a motion to withdraw brought in the court of appeals may be premature. *Id.* A counsel's belief that the client has no grounds to seek further review from the court of appeals' decision does not constitute good cause for withdrawal. *Id.* Anthony's counsel's motion to withdraw states only her determination that an appeal would be frivolous. Accordingly, no good cause has been shown, and we deny counsel's motion to withdraw.[4] *See id.*; *see also In re A.A.Z.*, 2021 WL 5225440, at *8 (denying a motion for withdrawal considering *In re P.M.* where it did not show "good cause" other than counsel's determination that an appeal would be frivolous).

---

[4] The Texas Supreme Court has noted that, in cases such as this, "appointed counsel's obligations [in the supreme court] can be satisfied by filing a petition for review that satisfies the standards for an *Anders* brief." *In re P.M.*, 520 S.W.3d 24, 27–28 (Tex. 2016).

## VI. CONCLUSION

We affirm the trial court's judgment.

CLARISSA SILVA
Justice

Delivered and filed on the
22nd day of June, 2023.